544 S.E.2d 30

**The STATE, Respondent,**

v.

**Spencer Leonard McHONEY, Appellant.**

No. 25264.

Supreme Court of South Carolina.

Heard Jan. 11, 2001.

Decided March 19, 2001.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Derrick K. McFarland, all of Columbia, and Solicitor David P. Schwacke, of North Charleston, for respondent.

Deputy Chief Attorney Joseph L. Savitz, III, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

TOAL, Chief Justice:

Spencer Leonard McHoney ("McHoney") appeals his murder conviction and his life imprisonment sentence. We affirm.

### FACTS/PROCEDURAL BACKGROUND

On November 15, 1995, Violet White's ("Victim") parents went to her home and found her with her throat slashed and

with numerous stab wounds in her abdomen. Her parents rushed her to the hospital where Helen Nelson ("Nelson"), a nurse on duty, attended to her. Nelson testified that when the victim was removed from her parent's vehicle, the victim's head fell back "like a PEZ toy," and the width of the cut on her neck was wide enough to "lay her arm in it."

Nelson talked to the victim while the physicians were trying to stabilize her for transfer to another trauma center. Although the victim was unable to speak, she was able to nod in response to questions by Nelson. Nelson asked the victim if she knew who stabbed her, and the victim nodded yes. Nelson asked her if her family knew the attacker, and the victim again nodded her head yes. When asked if her attacker lived in her neighborhood, the victim nodded yes. However, the victim shook her head no when Nelson asked if her boyfriend was the attacker.

At the suggestion of the physician, Nelson recited the alphabet and asked the victim to nod her head when she reached the attacker's initials. When Nelson got to the letter "S", the victim nodded. Nelson began the alphabet again and when she got to the letter "P", victim nodded. Nelson asked the victim if "SP" were the initials of her attacker and she shook her head no. The victim nodded her head when Nelson asked her if she was attempting to spell her attacker's name. Nelson questioned the victim in this manner for approximately thirty to forty minutes.

When the intensive care helicopter arrived, Nelson told the victim she was going to a hospital where she would get the "best care from the best doctors." Nelson then assured the victim she would be fine. In response to Nelson's statement, the victim looked at her, shook her head no, and closed her eyes. The victim lost consciousness before the flight, and she died two weeks later without regaining consciousness.

The doctor who performed the autopsy testified the victim was stabbed seven times in her abdomen and had a four inch long incised wound across her neck. The victim died from aspirating blood as a result of her injuries.

McHoney was quickly associated with the murder. McHoney, whose first name begins with "SP", was a known crack addict the police had previously used as an informer. Another

crack addict testified he saw McHoney driving the victim's car around the time of her murder. On November 17, 1995, McHoney fully confessed to police that he robbed and violently murdered the victim to get money for crack.

In January 1996, McHoney was indicted for the victim's murder. The State provided McHoney its notice of intention to seek the death penalty relying on the aggravating circumstances of criminal sexual conduct, physical torture, armed robbery, and larceny with a deadly weapon. The case proceeded to trial on April 28, 1997. In May 1997, the jury found McHoney guilty of murder accompanied by all aggravating circumstances except criminal sexual conduct. McHoney was sentenced to life imprisonment.

On July 21, 1998, McHoney's counsel filed an *Anders* brief that raised the following two issues:

I. Did the trial judge err by allowing into evidence, as a dying declaration, the victim's identification of "SP" as her killer?

II. Did the trial judge err by excluding evidence McHoney passed a polygraph test when questioned about the victim's death?

McHoney sent the Court a *pro se* brief raising the following four additional issues:

III. Did the trial judge err by denying McHoney's directed verdict motion, where the State failed to introduce any substantial evidence he was guilty of the victim's murder?

IV. Did the trial judge err by instructing the jury they could not acquit McHoney unless "[t]here is a real possibility that he is not guilty," because this instruction diluted the State's burden of proving guilt beyond a reasonable doubt?

V. Did the trial judge err by allowing the solicitor to ask a leading question of a key State's witness, which improperly bolstered the credibility of that witness?

VI. Did the trial judge err by rejecting the jury's request to visit the location where a key State's witness testified he saw McHoney driving the victim's car?

On July 17, 2000, we denied McHoney's attorney's petition to be relieved as counsel, and directed him to brief all six issues.

## LAW/ANALYSIS

### I. Dying Declaration

McHoney argues the trial judge erred by admitting the victim's identification of "SP" as her killer under the dying declaration exception to the hearsay rule, Rule 804(b)(2), SCRE, because there was no evidence the victim believed her death was imminent, and the victim did not die until two weeks after making the statements. We disagree.

Hearsay is not admissible unless it fits within an exception to the hearsay rule. Rule 802, SCRE. The State sought to introduce the victim's identification of "SP" as her killer under the dying declaration exception. Rule 804(b)(2), SCRE. A statement made under the belief of impending death is not excluded by the hearsay rule if the declarant is unavailable as a witness in a prosecution for homicide, the statement is made by a declarant while believing the declarant's death is imminent, and the statement concerned the causes or circumstances of what the declarant believed to be impending death. Rule 804(b)(2), SCRE; *see also* 29A AM.JUR.2D *Evidence* § 829 (Supp.2000) ("In a homicide prosecution, the dying declaration must bear on the fact of the homicide and the person by whom it was committed. Such statements must be made voluntarily and in good faith. In addition, such statement must be made under a sense of impending death.").

McHoney argues there was no evidence the victim believed her death was imminent at the time of her declaration. According to defense counsel:

> If this nurse who has been taking care of me and talking to me says I am going to be fine and I am getting the best medical treatment possible, then exactly the opposite would have been understood by the declarant. So it would not qualify as a dying declaration.

The medical personnel who attended the victim assured her she would be "fine." However, the victim shook her head no

in response to the assurances, indicating she was aware of her impending death.

A declarant does not have to express, in direct terms, his awareness of his condition for his statement to be admissible as a dying declaration. The necessary state of mind can be inferred from the facts and circumstances surrounding the declaration. *See Louisiana v. Bell,* 721 So.2d 38 (La.Ct.App. 5th Cir.1998); *Louisiana v. Nicholson,* 703 So.2d 173 (La.Ct.App. 4th Cir.1997); *Louisiana v. Matthews,* 679 So.2d 977 (La.Ct.App. 4th Cir.1996). Repeated questioning by the declarant concerning whether he is going to live, a less than reassuring answer, the nature of the wound, and the declarant's critical condition are circumstances that indicate the declarant's awareness of approaching death. *Charles v. Texas,* 955 S.W.2d 400 (Tex.Ct.App.1997).[1] In fact, a declarant can be aware of imminent death even when he is assured he will not die and will be fine. *See id.* at 404 (holding evidence was sufficient for trial court to infer victim believed her death was imminent where victim had severe burns all over her body, she asked if she was going to die, and the officer replied negatively to reassure her and to prevent shock).

Furthermore, the length of time the declarant lives after making the dying declaration is immaterial. The focus is on the declarant's state of mind when the statement is made, not on the eventual outcome of the declarant's injuries. *See State v. Hall,* 134 S.C. 361, 133 S.E. 24 (1926).[2] In *State v.*

---

1. *See, e.g., Illinois v. Georgakapoulos,* 303 Ill.App.3d 1001, 237 Ill.Dec. 156, 708 N.E.2d 1196 (1999) (holding the belief in the imminence of death may be demonstrated by the declarant's own statement or from circumstantial evidence, such as the nature of the wounds or statements made in his presence); *Louisiana v. Lucas,* 762 So.2d 717 (La.Ct.App. 1st Cir.2000) (finding the magnitude of the victim's gunshot wound, the victim's knowledge he was going into surgery, his obvious pain, and his "serious" tone of voice provided enough evidence to infer victim was aware of his imminent death).

2. *See also North Carolina v. Hamlette,* 302 N.C. 490, 276 S.E.2d 338 (N.C.1981) (holding the fact victim lingered for several days after his communication to police officer that defendant was the man who shot him did not render statement inadmissible as a dying declaration); *North Carolina v. Stevens,* 295 N.C. 21, 243 S.E.2d 771 (1978) (the fact victim survived one week longer than doctors told him he might live did

*Hall,* we held a dying declaration was properly admitted when the declaration was made shortly after the injury, and the declarant died 33 days later. We held it was the jury's duty to pass upon the credibility of the dying declaration, and the length of time between the declaration and death is just one factor to be considered. *Id.* at 361, 133 S.E. at 26.

In the instant matter, the fact the victim died two weeks after her injury does not indicate the victim did not believe her death was imminent, where she shook her head when told she would be fine, and where she never regained consciousness after she made the declaration. Therefore, we find the trial judge properly admitted the victim's identification of "SP" as her killer under Rule 804(b)(2), SCRE.

Although we find the victim's statement was a valid dying declarations, her statement also satisfies the excited utterance exception to the hearsay rule. Rule 803(2), SCRE. An excited utterance is a statement relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or condition. Rule 803(2), SCRE. "The basis for the excited utterance exception to the hearsay rule is that the perceived event produces nervous excitement, making fabrication of the statements about the event unlikely." 29A AM.JUR.2D § 865 (1994). An excited utterance expresses the real belief of the speaker because the utterance is made under the immediate and uncontrolled domination of the senses, rather than under reason and reflection. *Id.*

In determining whether a statement falls within the excited utterance exception, a court must consider the totality of the circumstances. *State v. Dennis,* 337 S.C. 275, 523 S.E.2d 173 (1999). In this case, the victim was rushed to the

not render victim's dying declaration inadmissible); *Thomas v. Arkansas,* 62 Ark.App. 168, 973 S.W.2d 1 (1998) (holding under the dying declaration exception, it is declarant's belief in nearness of death when he makes the statement, not the swiftness with which death actually ensues, that is most important); *Charles v. Texas,* 955 S.W.2d 400 (Tex.Ct.App.1997) (holding length of time declarant lives after making dying declaration is immaterial in determining if statement is dying declaration for purposes of hearsay exception); *Herrera v. Texas,* 682 S.W.2d 313 (Tex.Crim.App.1984) (length of time declarant lives after making dying declaration is immaterial to dying declaration exception).

hospital and immediately bombarded by medical personnel. When the victim arrived at the hospital, she was still under the continuing stress of being stabbed seven times in the abdomen and having her throat slit. There was no time for the victim to reflect on the event, so her statement is inherently reliable. *See id.* (the rationale behind the excited utterance exception is the startling event suspends the declarant's process of reflective thought, reducing the likelihood of fabrication). Therefore, because her statement was made under the continuing stress of the attack, it is admissible as an excited utterance. Rule 803(2), SCRE:[3]

## II. Polygraph Results

■ McHoney argues the trial judge erred by excluding evidence he passed a polygraph test when questioned about the victim's death. We disagree.

The police administered a polygraph test the day after the victim's murder. The polygraph examiner asked McHoney whether he stabbed the victim or knew who did. He answered "no" to both questions, and the polygraph examiner, who was an expert in interrogation and body language, concluded McHoney was telling the truth.

At the start of the trial, the State objected to the admission of the polygraph results based on their unreliability. The trial judge agreed and excluded the evidence pursuant to *State v. Wright*, 322 S.C. 253, 471 S.E.2d 700 (1996). McHoney did not

---

**3.** The totality of the circumstances indicate the victim was under the stress of the startling event of being violently attacked, even though she did not make her statements until asked by the nurse at the hospital. The victim did not make her statements contemporaneously with her attack simply because her throat was cut and she could not speak. Therefore, the time lapse between the attack and her statements is immaterial because she communicated with the nurse at the first opportunity. *See Webb v. Lane*, 922 F.2d 390 (7th Cir.1991) (statements made up to two hours after victim had been shot six times in the chest and abdomen, in which he identified assailant, were admissible under excited utterance exception to the hearsay rule); *State v. Harrison*, 298 S.C. 333, 380 S.E.2d 818 (1989) (allowing as res gestae the statements of an attempted sexual assault victim to an officer at the hospital upon first opportunity to tell what occurred to her); *State v. Blackburn*, 271 S.C. 324, 247 S.E.2d 334 (1978) (noting that a time interval of over one hour, and up to eleven hours, did not necessarily eliminate a statement as part of the res gestae).

present any evidence concerning the reliability of polygraph examinations.

We recently addressed the admissibility of polygraph examinations in *State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999). We held that the results of polygraph examinations are generally inadmissible because the reliability of the test is questionable. *Id.* at 23, 515 S.E.2d at 519; *see also Wright, supra; State v. Copeland*, 278 S.C. 572, 300 S.E.2d 63 (1982). Furthermore, the United States Supreme Court recently held that a *per se* rule against the admission of polygraph evidence does not violate a defendant's right to present relevant evidence in his defense as guaranteed by the United States Constitution. *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). According to the United States Supreme Court, "there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." *Id.*, 118 S.Ct. at 1265.

However, in light of the adoption of the SCRE, we held in *Council* that the admissibility of polygraph evidence should be analyzed pursuant to Rules 702 and 402, SCRE and the factors outlined in *State v. Jones*, 273 S.C. 723, 259 S.E.2d 120 (1979). Under Rule 702, SCRE, the trial judge must find: (1) the scientific evidence will assist the trier of fact; (2) the expert witness is qualified; and (3) the underlying science is reliable.[4] The trial judge should determine the reliability of the underlying science by using the *Jones* factors: the publication of peer review of the technique; prior application of the method to the type of evidence involved in the case; the quality control procedures used to ensure reliability; and the consistency of the method with recognized scientific laws and procedures. *Council, supra.* Further, if the evidence is admissible under Rule 702, SCRE, the trial judge must determine if its probative value is outweighed by its prejudicial effect under Rule 403, SCRE.

---

4. Rule 702, SCRE, states:

 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

As we indicated in *Council*, at the time of McHoney's 1997 trial, polygraph examinations were generally not admissible because of their unreliability. Therefore, the trial judge did not abuse his discretion by excluding the polygraph results. Furthermore, even under a *Council* analysis, McHoney did not meet his burden of proof under Rule 702, SCRE because he did not present any evidence that polygraphs were inherently reliable, the polygraph was reliable and properly conducted in this case, or that the *Jones* factors were met.

## III. Directed Verdict Motion

McHoney argues the trial judge erred by denying his directed verdict motion because the State failed to introduce substantial evidence he was guilty of murder. Specifically, McHoney contends the State presented evidence that was totally unreliable. We disagree.

A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *State v. Brown*, 103 S.C. 437, 88 S.E. 21 (1916). In reviewing a motion for directed verdict, the trial judge is concerned with the existence of the evidence, not with its weight. *State v. Mitchell*, 341 S.C. 406, 535 S.E.2d 126 (2000). On appeal from the denial of a directed verdict, an appellate court must view the evidence in the light most favorable to the State. *State v. Burdette*, 335 S.C. 34, 515 S.E.2d 525 (1999); *State v. Kelsey*, 331 S.C. 50, 502 S.E.2d 63 (1998). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury. *State v. Pinckney*, 339 S.C. 346, 529 S.E.2d 526 (2000).

McHoney argues the State's case was based on unreliable evidence. However, in ruling on a directed verdict motion, the trial judge is concerned with the existence of the evidence, not its weight. *Mitchell, supra; State v. Williams*, 303 S.C. 274, 400 S.E.2d 131 (1991). We find the State presented enough evidence to survive a directed verdict motion.

Viewing the evidence in a light most favorable to the State, there was evidence that reasonably tended to prove McHoney's guilt. The victim's dying declaration tended to inculpate McHoney. McHoney gave a full confession two days

after the crime where he admitted to choking the victim, stomping on her neck, stabbing her repeatedly in the abdomen until the knife bent, using another knife to slit the victim's throat, and stabbing the victim in the chest with the second knife until it bent. Furthermore, a witness saw McHoney driving the victim's car around the time of the crime.

## IV. Reasonable Doubt Instruction

McHoney contends the trial judge gave an erroneous reasonable doubt instruction. He contends it was error to instruct the jury they could not acquit unless "there is a real possibility that he is not guilty" because the instruction diluted the State's burden of proving guilt beyond a reasonable doubt. We disagree.

The trial judge gave the following reasonable doubt instruction, in relevant part:

So the burden of proof then is upon the state to establish by evidence to your satisfaction the guilt beyond a reasonable doubt of the defendant here on trial. Now, what is a reasonable doubt in the law? A reasonable doubt is a doubt that would cause a reasonable person to hesitate to act. As I told you, the state has the burden of proving the defendant guilty beyond a reasonable doubt. . . .

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. . . . If based upon your consideration of the evidence you are firmly convinced that the defendant is guilty of the crime charged, then you must find him guilty. *If on the other hand you think there is a real possibility that he is not guilty, you must give him the benefit of that doubt and find him not guilty.* (emphasis added).

We specifically approved a similar reasonable doubt instruction in *State v. Darby*, 324 S.C. 114, 477 S.E.2d 710 (1996). As we stated in *Darby*, "[c]ourts specifically addressing whether the 'real possibility' language lessens the government's burden of proof have held it does not in the context of the preceding language requiring that the juror be 'firmly convinced' of the defendant's guilt." *Id.* at 116, 477 S.E.2d at 711 (citations omitted). We also found there is nothing in this language to suggest the defendant bears the burden of proof. *Id.* Fur-

thermore, the "real possibility" language is found in the proposed jury instruction developed by the Federal Judicial Center, and was cited with approval in Justice Ginsberg's concurring opinion in *Victor v. Nebraska*, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). *Id.* at n. 1. Finally, we approved the use of the "real possibility" language in *State v. Needs*, 333 S.C. 134, 508 S.E.2d 857 (1998), and the Court of Appeals approved the language in *State v. Lowery*, 332 S.C. 261, 503 S.E.2d 794 (Ct.App.1998).

## V. Leading Question

 McHoney argues the trial judge erred by allowing the solicitor to ask a leading question of a key witness, which improperly bolstered the credibility of that witness. We disagree.

 On redirect examination of the State's witness, who testified he saw McHoney driving the victim's car, the solicitor asked, "[Y]ou don't know—you are not—are you connected closely with either side of this case, either the victim or the defendant?" The witness answered, "The defendant are [sic] my family. I am not related to the victim." Both McHoney and the State agree defense counsel did not object to the question or the answer. Therefore, the issue is not preserved because a contemporaneous objection is required to preserve issues for direct appellate review. *State v. King*, 334 S.C. 504, 514 S.E.2d 578 (1999). The question was also cumulative to other evidence because the witness had previously testified he was related to McHoney.

 "A leading question is one which suggests to the witness the desired answer. . . . In order to require reversal, appellant must show an abuse of discretion resulting in prejudice." *State v. Tyner*, 273 S.C. 646, 258 S.E.2d 559, 563 (1979). The contested question provided the witness with a choice of answers and did not require a "yes" or "no" response. Further, no prejudice was demonstrated because the question was cumulative.

## VI. Visiting the Crime Scene

McHoney asserts the trial judge erred by denying the juror's request to visit the "41 Quick Stop," a location where a

State's witness testified he saw McHoney driving the victim's car around the time of the murder. We disagree.

Jury views are controlled by S.C.Code Ann. § 14–7–1320 (1976 ), which provides:

> The jury in any case may, *at the request of either party*, be taken to view the place or premises in question or any property, matter or thing relating to the controversy between the parties when it appears to the court that such view is necessary to a just decision, if the party making the motion advances a sum sufficient to pay the actual expenses of the jury and the officers who attend them in taking the view, which shall be afterwards taxed like other legal costs if the party who advanced them prevails in the suit.

A jury view of a scene is a matter within the discretion of the trial judge. *Kincaid v. Landing Dev. Corp.*, 289 S.C. 89, 344 S.E.2d 869 (Ct.App.1986) (citations omitted). The trial judge's decision will not be reversed absent an abuse of discretion. *Id.*

During jury deliberations in this matter, the jury sent a message to the trial judge asking: "Will it be possible to visit the 41 Quick Stop at nighttime?" The trial judge declined the request, informing the jury they must decide the case based on the evidence presented. Similarly, in *Gossett v. State*, 300 S.C. 473, 388 S.E.2d 804 (1990), the jury sent a note to the trial judge asking if they could view the scene of the crime. We found the trial judge was correct in denying the jury's visit to the crime situs because section 14–7–1320 mandates that a *party* make a motion before a jury view is allowed. *Id.* at 477, 388 S.E.2d at 806.

Based on our opinion in *Gossett, supra,* the trial judge was correct in denying the jury view of the crime situs. However, even assuming a proper motion was made, a jury view was not necessary for the jury to make a just decision. The jury wanted to view the scene at night because they were concerned the State's witness did not have enough light to clearly identify McHoney. However, a jury view of the scene was unnecessary because: (1) a photograph of the scene was admitted into evidence indicating a street light was in the vicinity of the scene; and (2) the witness testified he had enough light to recognize McHoney.

## CONCLUSION

Based on the foregoing, we **AFFIRM** the conviction and sentence of the trial court.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.