556 S.E.2d 413

**The STATE, Respondent,**

v.

**Donald Ray WIMBUSH, Appellant.**

**No. 3402.**

Court of Appeals of South Carolina.

Submitted Oct. 1, 2001.

Decided Nov. 5, 2001.

Rehearing Denied Dec. 20, 2001.

---

6. In light of our disposition discussed herein, we need not address the parties' remaining issues on appeal.

Chief Attorney Daniel T. Stacey, of S.C. Office of Appellate Defense, of Columbia, for Appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Robert E. Bogan, Assistant Attorney General S. Creighton Waters; and Solicitor C. Kelly Jackson, of Sumter, for Respondent.

CURETON, J.:

Donald Ray Wimbush was convicted of two counts of murder and one count of possession of a weapon during the commission of a violent crime. Wimbush appeals, arguing the trial court erred in failing to grant a directed verdict and in allowing the testimony of a State's witness. We affirm.[1]

### FACTS

This is a circumstantial evidence case. The evidence, viewed in the light most favorable to the State, is as follows. The two victims, Elijah Hunt and Kevin White, were found shot to death at the T & T nightclub by a passerby around noon on November 17, 1995. When the police arrived at the scene they found Hunt on the floor near a door entering the pool table area and Kevin White lying on the floor near the pool table. Police recovered ten beer cans in the pool table area. Seven empty beer cans were found on the table near

---

1. Because oral argument would not aid the court in resolving the issues on appeal, we decide this case without oral argument pursuant to Rule 215, SCACR.

White, two opened beer cans were on a chair in the pool table area next to White, and one unopened can was on the floor. A black Nike cap was found lying on top of White's left arm. A Dallas Cowboys blue knit cap was found near White's body. The door to the premises was unlocked, but the keys were found at the scene.

A SLED expert in fingerprint analysis tested forty-four latent fingerprints taken from the ten beer cans and found six prints matched the appellant Wimbush and three matched the victim Hunt. A ballistics expert found that Hunt was shot with a .357 magnum or a .38 caliber handgun. The bullet fragments taken from White were unsuitable for identification.

Peggy Nelson, Hunt's niece, stated she ran the T & T nightclub and that she closed it between 8:00 p.m. and 8:30 p.m. on November 16, 1995 because they had no customers. She lived five doors down from the club on Pelfrey Road, and Hunt had been living with her for about a month. Nelson stated that before she left the club, she locked the doors and cleaned up, throwing away all the beer cans she could find. Nelson stated she was certain she had picked up every can that was in plain view.

Nelson testified the last time she saw her uncle alive was when he was standing in her kitchen sometime between 12:30 a.m. and 1:30 a.m. in the early morning hours of November 17th. Nelson stated Hunt had access to the keys to the T & T nightclub, which were found at the scene, because he would sometimes go down to the club in the afternoon to get a fire started in order to warm the building before she arrived. She noted Wimbush had previously been to the club, but she could not recall how often.

Daphne Nelson called Hunt, her uncle, at her mother's (Nelson's) house and spoke to him for about five minutes around 12:30 a.m. on November 17th. Hunt was to bring her daughter's clothes over to her home, but Hunt never made it to her house.

Wadell Mack stated he saw the victim Kevin White with Wimbush around 11:00 p.m. on November 16, 1995, when White and Wimbush were standing in the road in front of his home. Wadell confirmed he sold Wimbush a .357 magnum handgun for $100 in April of 1995.

Travis Mack, whose sister was dating White, testified he saw Wimbush and White together, on the night of November 16, 1995, while they were all standing around a fire in his yard, and he noticed Wimbush was carrying a .357 handgun. According to Mack, the next time he saw Wimbush was around 3:30 a.m. on the morning of November 17th when Wimbush came over and asked White to go with him to get a drink. Mack stated White refused at first, telling Wimbush, "I'm not f* * *ing with you." Wimbush left the room and came back, telling White he had some liquor. White then dressed and left with Wimbush. Before he left, White told Mack that he "was going to Elijah's [Hunt's] house to get a beer" and that he would "be right back." However, White never returned home, and Mack never saw Wimbush again.

Mack stated when Wimbush left he was wearing blue jeans, a black Nike cap, and a FILA jacket. Mack positively identified the hat retrieved at the scene as being the one Wimbush was wearing when he left with White. Mack stated White was wearing a Dallas Cowboys blue knit cap with a star on the front.

Around 6:00 a.m. on November 17th, Wimbush arrived at Victoria Delay's house. Delay had met Wimbush before but they were not friends. Delay testified that when she opened the door, "He [Wimbush] said he didn't want to hurt anybody. He just needed a ride home, because his girlfriend had left him back there in the projects." Delay told Wimbush to wait in her car while she got ready for work, and he came back to her door twice, at one point asking her if she had any company at her home. When she came out to leave, Wimbush was gone. As she drove down the street, Delay saw Wimbush walking and gave him a ride to his girlfriend's house. Wimbush told Delay that he needed to go home to get some sleep. Wadell Mack, who left for work each morning at 6:30 a.m., confirmed that he saw Wimbush walking along the road around 6:35 a.m. on November 17, 1995.

Mary Mack, who at the time of the murders had been Wimbush's girlfriend for a year and a half, testified that Wimbush arrived at her home around 6:45 a.m. on November 17th. Mary had given Wimbush a ride out to "the country," as she called it, the evening before. Wimbush told Mary that

he had just talked to his mother and that he needed a ride to the bus station so he could go to New York because his sister was sick. Mary dropped Wimbush off at the bus station but did not see him enter. Wimbush told her he would be back the following Thursday in order to go to a wedding they had planned to attend together on Saturday. However, Wimbush did not return, and Mary never heard from him again until nearly a year later when he was in the Sumter County Jail. Notably, Wimbush's mother and the purportedly sick sister did attend the wedding on Saturday as scheduled.

After the State rested, Wimbush moved for a directed verdict. The trial court denied the motion, finding there was sufficient circumstantial evidence presented to create a question of fact for the jury as to Wimbush's guilt.[2] The jury convicted Wimbush of two counts of murder and one count of possession of a weapon during the commission of a violent crime. He received concurrent sentences of life in prison on each murder conviction and five years for possession of a weapon. This appeal followed.

## *LAW/ANALYSIS*

### I.  Directed Verdict Motion

Wimbush first contends the trial court erred in denying his motion for a directed verdict because the State failed to present substantial circumstantial evidence of his guilt. We disagree.

In *State v. McHoney,* 344 S.C. 85, 544 S.E.2d 30 (2001), our supreme court recently reiterated the standard for reviewing the denial of a directed verdict motion:

> A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged. *State v. Brown,* 103 S.C. 437, 88 S.E. 21 (1916). In reviewing a motion for directed verdict, the trial judge is concerned with the existence of the evidence, not with its weight. *State v. Mitchell,* 341 S.C. 406, 535 S.E.2d 126 (2000). On appeal from the denial of a directed verdict, an appellate court must view the evidence in the light most favorable to the State. *State v. Burdette,* 335 S.C. 34, 515

---

2.  Wimbush did not testify and presented no evidence at trial.

S.E.2d 525 (1999); *State v. Kelsey*, 331 S.C. 50, 502 S.E.2d 63 (1998). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury. *State v. Pinckney*, 339 S.C. 346, 529 S.E.2d 526 (2000).

*Id.* at 97, 544 S.E.2d at 36.

■ Viewing the evidence in the light most favorable to the State, we find the State presented substantial circumstantial evidence to survive a motion for directed verdict. Witnesses testified that Wimbush had purchased a .357 handgun and that he had this gun with him shortly before the murders. The police confirmed that at least one of the victims was shot with a .357 handgun or a .38 pistol. Further, Wimbush was last seen with White around 3:30 a.m. the morning of November 17th, when he reluctantly left with Wimbush to get some beer from Hunt. The door to the T & T nightclub was unlocked, not broken, and Hunt was known to have access to the keys, which were also found at the scene.

There was also physical evidence placing Wimbush at the scene of the murders because his fingerprints were found on several of the beer cans located in open view near the bodies. In addition, a black Nike cap lying on top of White's body was positively identified as belonging to Wimbush and as being the hat Wimbush was wearing when he left with White shortly before the murders.

There were also inconsistent statements and evidence of flight from which inferences of guilty knowledge or intent may be drawn. Wimbush asked someone he hardly knew, Delay, for a ride around 6:00 a.m., saying he wasn't there to "hurt" anybody, and telling her he wanted to go home to sleep. However, his subsequent statement to his girlfriend only minutes later was that he had just spoken to his mother and had to leave town immediately. Further, his action in immediately leaving town the morning of the murders without contacting his girlfriend until nearly a year later is inconsistent with his statement that he would be returning the following week to attend a wedding. Cf., *e.g.*, *State v. Ballenger*, 322 S.C. 196, 200, 470 S.E.2d 851, 854 (1996) (reversing the Court of Appeals and finding a directed verdict was properly denied

by the trial court in a case involving possession of crack cocaine with intent to distribute, stating although no drugs were found in the defendant's possession when he was caught, evidence of the defendant's flight was "at least some evidence of guilt" that should have been considered by the reviewing court); *State v. Scott*, 330 S.C. 125, 131, 497 S.E.2d 735, 738 (Ct.App.1998) (holding the defendant's failure to return to his employer's premises after a routine audit "is, in essence, evidence of flight, which can be considered evidence of guilty knowledge and intent").

We find the evidence, though circumstantial, was sufficient to present a question of fact for the jury's determination as to Wimbush's guilt. Accordingly, we find the trial court correctly denied Wimbush's motion for a directed verdict.

## II. Testimony of State's Witness

Wimbush next asserts he is entitled to a reversal because the trial court allowed a State's witness to testify that he saw Wimbush and one of the victims selling drugs prior to the murders. We disagree.

The first witness at trial, Wadell Mack, testified that he last saw Wimbush with Kevin White when they were standing in the street in front of his (Wadell's) house selling drugs around 11:00 p.m. on November 16, 1995. Defense counsel objected to Mack's statement that Wimbush was selling drugs, stating, "I don't know where this is going." Upon questioning, counsel stated, "[M]y client is not accused of selling drugs." When the trial court again asked for the specific grounds for his objection, counsel did not offer anything further, and the court overruled the objection. After this brief reference, the questioning of the witness proceeded with no further testimony on this point, nor further objection from the defense.

On appeal, Wimbush contends the trial court committed reversible error in allowing the testimony that he was selling drugs. Wimbush asserts "[t]he evidence was inadmissible under any theory permitting character evidence pursuant to Rule 404, SCRE [and] *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923)." We find this issue is not preserved for our review as Wimbush did not articulate the grounds for objection that he now argues on appeal. *State v. Gardner*, 332 S.C. 389, 393–94, 505 S.E.2d 338, 340 (1998) (precluding issued from appellate

review where appellant objected but failed to articulate any meaningful grounds for the trial court's consideration); *State v. Hamilton,* 344 S.C. 344, 361, 543 S.E.2d 586, 595 (Ct.App. 2001) ("In order to preserve for review an alleged error, the objection should be sufficiently specific to bring into focus the precise nature of the alleged error so it can be reasonably understood by the trial judge.").

Although Wimbush contends, citing Rule 103(a)(1), SCRE, his objection was apparent from the context so that no specific objection was necessary, we do not agree, observing the trial court was not aware of the specific grounds for his objection.[3] Despite repeated requests by the trial judge, defense counsel failed to mention the words 'prior bad acts', 'Rule 404', '*State v. Lyle* ', or 'character evidence'. Further, Wimbush makes no argument on appeal that defense counsel was prohibited from making an appropriate objection. Rather, the transcript indicates defense counsel's statements trailed off and he failed to answer the trial court's final inquiry regarding the grounds for his objection.[4] Accordingly, we find no ground for reversal in this regard.

---

3.

Q. [] Let me ask you this, on November 16th, did you see him [Wimbush]?

A. Yeah, about 11 o'clock.

Q. At night or during the day?

A. I saw him a little bit during the day. And the last time I saw him was about 11 o'clock that night.

Q. 11 o'clock that night. Tell us where you saw him, who he was with, and what he was doing.

A. Well to him it's a day, they were selling drugs. And they stayed at the road for cars to come through. And they be out there all time of night. And my wife is——

MR. SPIGNER: Your Honor, I object. *I don't know where this is going.*

THE COURT: What's the objection? Just give me the grounds.

MR. SPIGNER: Your Honor, the defendant hasn't——

THE COURT: Just give me grounds, Mr. Spigner.

MR. SPIGNER: He's mentioned him selling drugs. I mean, *my client is not accused of selling drugs.*

THE COURT: *You still haven't given me the grounds for your objection, Mr. Spigner.*

MR. SPIGNER: Your Honor, I mean. . . .

THE COURT: Objection is overruled. Proceed. [Emphasis added.]

4. The *Court Reporter Manual* published in 2000 by South Carolina Court Administration contains provisions governing the body of the

## CONCLUSION

For the foregoing reasons, the conviction and sentence of Wimbush is

**AFFIRMED.**

HEARN, C.J., and HOWARD, J., concur.

transcript of record. This section instructs court reporters to indicate a trial participant's change of thought and start of a new sentence with two hyphens (—), and the interruption of a participant with three hyphens (———). In contrast, it states, "If a participant does not complete a sentence but was not interrupted, this should be indicated by three periods ( ... )." *Court Reporter Manual, State of South Carolina* § XV(D)(5) at 25 (2000).