THE STATE OF SOUTH CAROLINA

THIS OPINION HAS NO PRECEDENTIAL 
 VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT 
 AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
The State,       
Respondent,
 
 
 

v.

 
 
 
Annette W. Randolph,       
Appellant.
 
 
 

Appeal From Newberry County
James W. Johnson, Jr., Circuit Court Judge

Unpublished Opinion No. 2004-UP-186
Submitted March 8, 2004  Filed March 
 18, 2004

AFFIRMED

 
 
 
Assistant Appellate Defender Robert M. Dudek, of Columbia, 
 for Appellant.
Attorney General Henry Dargan McMaster, Chief Deputy Attorney 
 General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka 
 and Assistant Attorney General Derrick K. McFarland, all of Columbia; and Solicitor 
 W. Townes Jones, IV, of Greenwood, for Respondent.
 
 
 

PER CURIAM:  Annette Randolph (Appellant) was convicted of murder and 
 sentenced to life imprisonment without the possibility of parole.  Randolph 
 argues on appeal the trial court erred (1) by denying her motion for a directed 
 verdict of acquittal and (2) by ruling that she waived her right to challenge 
 the voluntariness of her statement to law enforcement.  We affirm. [1] 
FACTS
On March 3, 2001, Officer Kevin Hughes was dispatched to Appellants home in 
 response to a call that an individual needed medical help.  Upon Hughes 
 arrival, Michael Darby, the man who made the call to 911, invited him into the 
 home.  Hughes saw the decedent, Ronald Epps, lying on the couch with a small 
 towel over his face and a lot of blood around him.  Officer Hughes determined 
 Epps was dead and requested assistance.  Appellant was the only other 
 person present in the home and in an excited state.  Officer Hughes testified 
 there were no signs of forced entry and no mention of an intruder.
 Darby testified Appellant woke him up in the morning and asked him 
 to wake up Epps, who she said was on the couch with a towel over his face and 
 blood around him.  While Darby was attempting to wake Epps, Appellant 
 pointed out a hammer on the kitchen counter and asked him to move it.  He refused.  
 Recognizing that Epps needed medical attention, Darby called 911.  Assistance 
 arrived but Epps was deceased.
Officer Michael OConnell arrived at the scene and testified 
 that a hammer was found in the bottom drawer next to the stove.  Based on information 
 he obtained from Officer Hughes, Officer OConnell took the hammer first to 
 the morgue and later to the evidence locker.
Officer Danny Remion testified he recovered a hammer from 
 the home and it had rust on it.  Three days later, the hammer had even more 
 rust on it.  His testimony was that the rust was consistent with the hammer 
 having been recently washed.  He testified that there were traces of blood in 
 the shower in the master bathroom and in the sink in a second bathroom.  Officer 
 Chuck Counts testified that he tested the hammer and that it had recently been 
 wet.
The coroner testified Epps had been dead for several hours, and 
 the results of the autopsy indicated that a blunt object had been used.  
 Dr. Janice Ross performed the autopsy on the decedent and concluded that 
 he had been dead from four to five hours up to twelve hours.  She testified 
 she had seen the hammer and could not rule out that it could have been used 
 to cause the blunt force injury.
Epps girlfriend, Yvette Pratt, testified that she and Epps 
 had driven around Newberry the night of March 2.  He was carrying a roll of 
 cash totaling at least $1200 that night.  At trial, Officer Eddie Salizar 
 confirmed Pratts testimony, adding that he had searched Epps the evening of 
 March 2 between 8:00 and 9:00 p.m. on Wise Street and Epps had a lot of cash 
 on him.
At about 11:30 p.m., Pratt dropped Epps off where he resided, a trailer owned 
 by Appellant and her husband, Linart Randolph (Linart).  Pratt returned 
 to the trailer at about 1:00 a.m.  Appellant and Linart were arguing, and Linart 
 was walking around with a hammer.  Pratt left the trailer.  She testified that 
 Epps was alive when she left.
A witness testified that Linart was seen at a friends house about 3:00 a.m. 
 smoking crack and had a roll of money on him at the time.  A neighbor 
 testified that in the morning when the police arrived in response to the 911 
 call, she spoke to Appellant, who pulled out a roll of $100 bills.  Appellant 
 and Linart were subsequently arrested and charged with murder and criminal conspiracy.  
 The trial judge directed a verdict of acquittal on the criminal conspiracy charge 
 for each of them.  However, the jury found Appellant guilty of murder.  
 Appellant was sentenced to life imprisonment without the possibility of parole.
LAW/ANALYSIS
I.       Directed Verdict
Appellant contends the trial judge erred in denying her motion 
 for a directed verdict on the murder charge because there was nothing in the 
 States case to connect her to the murder.  We disagree.
On appeal from the denial of a directed verdict in a criminal 
 case, this Court must view the evidence in the light most favorable to the State.  
 State v. Al-Amin, 353 S.C. 405, 411, 578 S.E.2d 32, 35 (Ct. App. 2003); 
 State v. Morgan, 352 S.C. 359, 364, 574 S.E.2d 203, 205 (Ct. App. 2002). 
 When ruling on a motion for a directed verdict, the trial court is concerned 
 with the existence or nonexistence of evidence, not its weight. State v. 
 Wilds, 355 S.C. 269, 274, 584 S.E.2d 138, 140 (Ct. App. 2003).  If there 
 is any direct evidence or any substantial circumstantial evidence reasonably 
 tending to prove the guilt of the accused, this Court must find the case was 
 properly submitted to the jury.  State v. Harris, 351 S.C. 643, 653, 
 572 S.E.2d 267, 273 (2002).  On the other hand, if the State fails to produce 
 evidence of the offense charged, a defendant is entitled to a directed verdict.  
 State v. McHoney, 344 S.C. 85, 97, 544 S.E.2d 30, 36 (2001); State 
 v. Padgett, 354 S.C. 268, 271, 580 S.E.2d 159, 161 (Ct. App. 2003).
Appellant argues the evidence only raised a suspicion of 
 guilt.  Suspicion implies a belief or opinion as to the guilt based on facts 
 or circumstances that do not amount to proof.  State v. Buckmon, 347 
 S.C. 316, 322, 555 S.E.2d 402, 404 (2001) (citing State v. Lollis, 343 
 S.C. 580, 541 S.E.2d 254 (2001)). 
The State argues there is sufficient circumstantial evidence 
 to submit the murder charge to the jury.  On March 2, 2001, Epps lived in the 
 home owned by Appellant and Linart.  A friend, Darby, lived in the home with 
 them.  When Officer Hughes, the first officer to arrive, got to the house and 
 found Epps dead, Appellant and Darby were the only two people there.  Darby 
 had placed the 911 call to the police.  According to Officer Hughes, there was 
 no evidence of a forced entry.
Epps girlfriend, Pratt, testified she had spent most of 
 the day of March 2 with him and, when she dropped him off at the house at some 
 point that night, he had at least $1200 on him.  She stopped back by 
 the house later that night but left when Appellant and Linart were arguing.  
 Linart was walking around with a hammer in his hand.  She testified Epps was 
 alive when she left. 
Officer Salizar confirmed Pratts testimony about the money, 
 adding that he had searched Epps person sometime on March 2 between 8:00 and 
 9:00 p.m. on Wise Street and Epps had a lot of cash.  A witness testified Linart 
 was at a friends house at 3:00 a.m. and had a roll of money on him at that 
 time.  A neighbor testified that, after the police arrived in response 
 to the 911 call, she spoke to Appellant, who pulled out a roll of $100 bills.
After Darby tried to wake Epps and got no response, he saw 
 a hammer on the kitchen counter.  Appellant asked him to move it and he refused.  
 Officer Remion testified the hammer recovered from the home had rust on 
 it.  Over the next three days, the hammer had even more rust on it, consistent 
 with the hammer having been recently washed.  When Officer Chuck Counts tested 
 the hammer, he concluded that it had recently been wet.  Traces of blood were 
 found in the shower in the master bathroom and in the sink in a second bathroom. 
Officer Michael OConnell testified that he found a hammer 
 in the bottom drawer next to the stove.  He took the hammer first to the morgue 
 and later to the evidence locker.
 The coroner testified the decedent had been dead for several hours 
 and the results of the autopsy indicated that a blunt object had been used.  
 Dr. Janice Ross, who performed the autopsy on Epps, concluded that Epps 
 had been dead from four to five hours up to twelve hours and that she had 
 seen the hammer and could not rule out that it could have been used to cause 
 the blunt force injury.
The evidence in the instant case raised more than a mere suspicion 
 of guilt toward Appellant:

 
 Appellant had access to the victim;
 
 there was no evidence of a break-in;
 
 Appellant had spent her money 
 on crack cocaine;
 
 Epps had a roll of money hours 
 before the murder;
 
 Epps did NOT have money on him 
 when he was found dead;
 
 Appellant had a roll of money 
 hours after the murder;
 
 Appellant exhibited unusual behavior 
 with her neighbor;
 
 Appellant attempted to get someone 
 else to touch the hammer;
 
 the hammer had been washed;
 
 Appellant immediately began to 
 shift the blame to her husband or the victims girlfriend;
 
 Appellant attempted to mislead 
 law enforcement by asserting she did not know who was sleeping on her couch, 
 although the victim had been living with her for at least two weeks.

These facts, especially Appellants request to Darby to move 
 the hammer, that the hammer had been wet, that Epps had a considerable amount 
 of money when he got home and Appellant had a roll of money in the morning, 
 constitute sufficient circumstantial evidence presented by the State to warrant 
 submission of the case to the jury.
II.      Voluntariness of Appellants 
 Statement
Appellant argues the trial judge erred by ruling that she 
 waived her right to challenge the voluntariness of her statement.  We disagree.
At the start of the trial, the trial judge inquired 
 whether there were any pretrial motions, specifically, pursuant to Jackson 
 v. Denno. [2]   Appellant 
 answered that there were no motions.  The State did not introduce Appellants 
 statement in their case in chief.
 On direct examination by trial counsel, Appellant 
 testified that she returned to the trailer on Friday night and went to bed 
 around sometime Friday morning or it could have been Friday night, over into 
 Friday morning.  I really dont know the times. . . .  Appellant testified 
 she had voluntarily given a statement to Officer Hughes the morning of the incident.  
 She said she went to the police station voluntarily with Officer Hughes, read 
 her rights and knew what she was doing.  She said she made the statement voluntarily.  
 Trial counsel pointed out where Appellant had written on the third page of her 
 statement that she had gone to bed at 1:30 a.m., to which she responded: I 
 was just getting nervous and really confused and stuff.  And so, I really dont 
 know.  It could have been 10:30, 11:30, 12:30 or 1:30.  She testified 
 further that she was buying crack on Wise Street somewhere between 10:25 and 
 10:40 p.m.  At another point in her testimony, Appellant said she had been in 
 bed at 10:30 or 10:40 p.m.
When Appellant was questioned on cross-examination 
 about her statement, the following colloquy occurred:

[STATE:]  Officer Hughes did not pressure you?
[APPELLANT:]  He told me to write the statement.
[STATE:]  To write the statement.
[APPELLANT:]  He did not bother me.
[STATE:]  Didnt bother you?
[APPELLANT:]  No, he did not.
. . . .
[STATE:]  He didnt put any pressure on you to write this?
[APPELLANT:]  No.

Appellant testified she became confused and Officer Jackie 
 Swindler tried to cross her up, had her shook up, and was pressing her; 
 however, she never claimed the statement was involuntary.  In fact, her testimony 
 was that she gave the statement voluntarily.
 At the conclusion of cross-examination, the State 
 moved to introduce the statement.  Trial counsel objected because there is 
 no reason whatsoever to put it in there.  The judge sustained the objection, 
 but reserved the right to reverse himself.
At the close of the case, the State asked the judge 
 to revisit the issue of the statement being admitted into evidence.  The judge 
 admitted the statement into evidence, and trial counsel renewed his prior objection 
 arguing that admission of the written statement would give it more credibility 
 than the rest of the testimony.  Trial counsel was asked why a Jackson 
 v. Denno hearing was not requested.  Trial counsel responded with the argument 
 that nobody told him they were going to admit the statement.  In overruling 
 the objection, the judge explained that since the State did not attempt to put 
 the statement into evidence in their case in chief and trial counsel questioned 
 Appellant about it, voluntariness was waived and the State was entitled to cross-examine.
The conclusion of the trial judge as to the voluntariness 
 of a statement will not be disturbed unless so erroneous as to show an abuse 
 of discretion.  State v. Rochester, 301 S.C. 196, 200, 391 S.E.2d 244, 
 247 (1990); State v. Livingston, 223 S.C. 1, 6, 73 S.E.2d 850, 852 (1952).  
 For the trial judge to determine whether a statement was knowingly, intelligently, 
 and voluntarily made, an examination of the totality of the circumstances 
 surrounding the waiver must be made.  State v. Doby, 273 S.C. 704, 708, 
 258 S.E.2d 896, 900 (1979).  An express waiver is not necessary to support the 
 finding that a defendant has waived the right to counsel or the right to remain 
 silent.  North Carolina v. Butler, 441 U.S. 369, 373 (1979).
Trial counsel denied the offer for a Jackson 
 v. Denno hearing at the start of the case.  The State never introduced Appellants 
 statement in its case in chief.  The State only cross-examined Appellant on 
 specific issues of time after trial counsel introduced the contents of the statement 
 during direct examination.
Based on the foregoing facts, the trial judge was 
 correct in finding that the statement was given voluntarily and allowing it 
 into evidence.
CONCLUSION
Accordingly, based on the foregoing reasons, Appellants conviction and sentence 
 are
AFFIRMED.
HEARN, C.J., ANDERSON, and BEATTY,
JJ., concur.

 
 [1]
 
 
 We decide this case without oral argument pursuant to Rule 215, SCACR.

 
 [2]
 
 
 Jackson v. Denno, 378 U.S. 368 (1964).