682 S.E.2d 19

**The STATE, Respondent,**

v.

**Alphonso SIMMONS, Appellant.**

**No. 4569.**

Court of Appeals of South Carolina.

Heard April 22, 2009.

Decided June 17, 2009.

146

150

152

154

Appellate Defender M. Celia Robinson, of Columbia, for appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General, John W. McIntosh, Assistant Deputy Attorney General, Salley W. Elliott, Assistant Attorney General, Christina J. Catoe, all of Columbia; and Solicitor Warren B. Giese, of Columbia, for respondent.

GEATHERS, J.

Appellant Alphonso Simmons (Simmons) claims the circuit court erred on several grounds at his criminal trial for kidnapping, armed robbery, and grand larceny of a motor vehicle, which resulted in prejudice to Simmons and warrants a new trial. We affirm.

## FACTS

On April 19, 2004, at approximately 7:00 a.m., an armed robbery occurred at the McDonald's on Decker Boulevard in Columbia, South Carolina. The employees were held at gunpoint, robbed, and locked inside the restaurant's cooler. While inside the restaurant, the robber stole personal items from the employees and approximately $1,300 from the restaurant's safe. After fleeing the McDonald's, the robber stole a 2001 Pontiac Sunfire from the parking lot. The robber then removed the tires, the custom rims, an amplifier, and a custom speaker box, and he abandoned the car in a wooded area near the location of the robbery.

Simmons was arrested in an unrelated home invasion in Kershaw County on May 24, 2004, approximately one month after the McDonald's robbery. The police impounded Sim-

mons's vehicle, and the custom rims, speaker box, and amplifier from his vehicle were subsequently identified as those stolen from the Pontiac Sunfire. Shortly after Simmons's arrest in Kershaw County, he was transported to Richland County for questioning in connection with the McDonald's robbery.

Before the police questioned Simmons at Richland County police headquarters, Simmons was asked to give his palm print for identification purposes. Chief David Wilson, deputy chief of investigations for Richland County, testified that Simmons initially refused to give his palm print but consented after he explained the purpose behind taking the print.[1] While his palm print was being taken, Simmons indicated that he was hungry, so Chief Wilson requested a meal for Simmons.

Once Simmons gave his palm print, Chief Wilson escorted Simmons to his office. At that time, Chief Wilson read Simmons his *Miranda*[2] rights from a standard form. Simmons was not handcuffed or restrained in any way while in Chief Wilson's office. Chief Wilson then questioned Simmons on whether he understood his rights. Simmons stated he understood them as he was "familiar with the system." Simmons did not sign a waiver of rights form, but Chief Wilson testified that in his opinion, Simmons's actions demonstrated a knowing and voluntary waiver of his rights. Investigator Steven Faust, who was present when Chief Wilson read Simmons his *Miranda* rights, corroborated Chief Wilson's testimony.

Shortly thereafter, Simmons's meal arrived. While eating his meal, but before discussing the McDonald's robbery, Simmons requested that he be allowed to call his father, mother, and brother. Chief Wilson was unable to contact Simmons's

---

1. Chief Wilson testified at the in camera hearing that he initially went to Simmons's detention cell after he entered the building and overheard Simmons arguing with the lab officers about taking his palm print. The details of Chief Wilson's and Simmons's initial contact were excluded at trial because the circuit court ruled that the first palm print taken by the Richland County police was not admissible as it was taken prior to Simmons being served with the Richland County warrants.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

mother, but Simmons spoke with his father and brother over the phone, who then came to police headquarters and spoke with Simmons for approximately thirty minutes outside of the police's presence. Chief Wilson testified that he did not talk with Simmons specifically about the McDonald's robbery until after Simmons met with his family, as Simmons stated he would tell the police everything after meeting with his family.

After speaking with his father and brother, Simmons discussed the robbery with Chief Wilson and Captain James Smith. At some point, Captain Smith asked whether Simmons had viewed the videotape from the McDonald's robbery, at which time Simmons requested to view the videotape. Before Simmons made any admissions, Captain Smith told Simmons the quality of the surveillance tape was "pretty good." While viewing a close-up frame of the robber's face, Captain Smith testified that Simmons said, "Those are pretty good." Captain Smith then asked Simmons where the clothing was located that he was wearing in the video, and Simmons stated the clothing should be in his car. Chief Wilson also testified that Simmons identified himself as the robber in the video. Following this admission, Simmons confessed to stealing the money from McDonald's but claimed it was much less than the $1,300 allegedly stolen from the store's safe. Simmons was not willing to reduce his confession to writing. Chief Wilson stated the interrogation lasted approximately five hours, which did not include the time Simmons was in the holding cell.

The police served warrants on Simmons for the McDonald's robbery around 7:30 p.m. that evening, at which time Sergeant Barnes arrived to transport Simmons back to the Kershaw County detention center and to deliver a second meal to him. En route to the detention center, Sergeant Barnes stated that Simmons initiated conversation by asking whether Sergeant Barnes would be taking him to jail. Sergeant Barnes replied in the affirmative and stated that it had been a long day. Sergeant Barnes then testified that he told Simmons the police were tired of chasing him and that while Simmons had given the police a good chase, "he messed up when he stole the rims and stereo." Sergeant Barnes also stated that in response to his statements, Simmons nodded his head in agreement, smiled, and said, "It was fun while it lasted."

Prior to Simmons's arrest on May 24, 2004 in Kershaw County, Sergeant Scott McDonald presented several McDonald's employees with photographic line-ups in an attempt to identify the robber. Simmons's photo was not in any of the prior line-ups, and none of the witnesses made any positive identifications in the prior line-ups. The day Simmons was arrested in Kershaw and became a suspect in the McDonald's robbery, Sergeant McDonald returned to the McDonald's with a new photographic line-up containing Simmons's picture. Simmons's picture was the second photograph in a six-picture photo array. Sergeant McDonald separately presented the line-up to four employees with specific instructions not to discuss the matter with anyone. Two employees, L'Marshalett Moore and Sophia Thomas, positively identified Simmons as the robber in the photographic line-up and testified to the same at trial. Both Ms. Thomas and Ms. Moore testified unequivocally that they did not discuss their identifications with anyone else, including each other. Later that evening, based on the photographic identifications, the recovered car rims, and videotape footage from the McDonald's robbery, the Richland County police issued a warrant for Simmons's arrest.

Simmons was subsequently tried and convicted by a Richland County jury of eight counts of kidnapping, five counts of armed robbery, and one count of grand larceny of a motor vehicle. Simmons received a concurrent twenty-year sentence on each kidnapping charge and a concurrent ten-year sentence on each armed robbery charge as well as a concurrent ten-year sentence on the grand larceny charge. The latter charges of armed robbery and grand larceny were to run concurrent to each other, but consecutive to the kidnapping charges, for a total of thirty years confinement. This appeal followed.

## ISSUES ON APPEAL

(1) Did the circuit court's admission of limited testimony regarding the Kershaw County incident violate Rules 404(b) and 403, SCRE?

(2) Did the circuit court err in determining that Simmons's admissions to the police while in custody were freely and voluntarily made?

(3) Did the circuit court err in permitting two eyewitnesses to testify in court that they positively identified Simmons in a photographic line-up and a third eyewitness to testify that Simmons "looked like" the robber? Further, was it reversible error for the circuit court to deny Simmons's motion for a mistrial when the third witness once referred the robber as "the defendant" in her testimony?

(4) Did the circuit court err in permitting an investigating officer to testify when the officer entered the courtroom during another witness's testimony, despite the court's sequestration order?

(5) Did the circuit court err in requiring Simmons to give a second palm print at trial when the court previously ruled that the State had improperly obtained the first palm print during Simmons's custody in Richland County?

(6) Did the circuit court err in charging the jury to find Simmons not guilty if they found there was a "real possibility" that he was innocent?

## STANDARD OF REVIEW

In criminal cases, this Court will review errors of law only. *State v. Baccus,* 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). This Court is bound by the circuit court's factual findings unless they are clearly erroneous. *State v. Quattlebaum,* 338 S.C. 441, 452, 527 S.E.2d 105, 111 (2000). On review, this Court is limited to determining whether the circuit court abused its discretion. *State v. Rochester,* 301 S.C. 196, 200, 391 S.E.2d 244, 247 (1990). This Court does not reevaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the circuit court's ruling is supported by any evidence. *State v. Wilson,* 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001).

## LAW/ANALYSIS

### I. Admissibility of Kershaw County Incident

Simmons claims that the circuit court erred in permitting any testimony regarding the Kershaw County incident into evidence because the testimony violated Rules 404(b) and 403, SCRE. We disagree.

■ Evidence of other crimes, wrongs, or acts is inadmissible to prove the character of a person in order to show action in conformity therewith; however, such evidence may be admissible "to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent." Rule 404(b), SCRE. The evidence admitted "must logically relate to the crime with which the defendant has been charged." *State v. Beck,* 342 S.C. 129, 135, 536 S.E.2d 679, 682–83 (2000).

■ When the defendant has not been convicted of the prior crime, evidence of the bad act must be clear and convincing.[3] *Id.* If bad act evidence is clear and convincing and falls within the Rule 404(b) exception, it must nonetheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Rule 403, SCRE (although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice); *State v. Lyle,* 125 S.C. 406, 417, 118 S.E. 803, 807 (1923). "Unfair prejudice means an undue tendency to suggest decision on an improper basis." *State v. Dickerson,* 341 S.C. 391, 400, 535 S.E.2d 119, 123 (2000). Finally, the determination of prejudice must be based on the entire record, and the result will generally turn on the facts of each case. *State v. Gillian,* 373 S.C. 601, 609, 646 S.E.2d 872, 876 (2007).

## A. Kershaw County Arrest and Stolen Rims

Prior to the introduction of any testimony pertaining to the Kershaw County arrest, the circuit court conducted a pre-trial hearing regarding its admissibility under Rule 404, SCRE. The circuit court ruled that the State could not question the police on the details of the home invasion and the pursuit and capture of Simmons, or on the fact that he was bleeding and wounded at the time of his apprehension. The circuit court, however, found evidence of the stolen rims on Simmons's vehicle was admissible for purposes of linking Simmons with the McDonald's robbery.

---

3. Clear and convincing evidence is more than a mere preponderance, but less than is required for proof beyond a reasonable doubt; it does not mean clear and unequivocal. *State v. Fletcher,* 379 S.C. 17, 24, 664 S.E.2d 480, 483 (2008).

Over Simmons's objection at trial, Lieutenant Kirk Corley testified that he apprehended Simmons off of a dry creek bed in the woods on the evening of April 25, 2004.[4] Corley stated the police took Simmons into custody and subsequently impounded his vehicle, which was discovered in close proximity to where the police apprehended him. When questioned as to whether there were any distinguishable items on the vehicle, Corley responded that the car had "fairly new shiny rims." The State presented additional testimony to establish that two swabs of dried blood were removed from the recovered rims and transported to SLED for DNA analysis, which were then positively matched to DNA samples taken from Simmons.

The circuit court did not err in admitting the objected-to testimony because it clearly linked Simmons to the McDonald's robbery, which is permissible under Rule 404(b), SCRE. Here, the evidence of the arrest in Kershaw was limited in scope to demonstrate how the police obtained custody of Simmons's vehicle, particularly the stolen rims, which was necessary to connect Simmons to the McDonald's robbery. *See Lyle*, 125 S.C. at 417, 118 S.E. at 807 ("If [evidence of another crime] is logically pertinent in that it reasonably tends to prove a material fact in issue, it is not to be rejected merely because it incidentally proves the defendant guilty of another crime."). The evidence and witness testimony positively showed that the rims on Simmons's vehicle were those stolen from the Pontiac Sunfire in the McDonald's parking lot. Consequently, the manner by which the police lawfully obtained custody of these rims from Simmons's vehicle was logically related to the instant case. *See State v. Stokes*, 381 S.C. 390, 405, 673 S.E.2d 434, 441 (2009) (finding evidence of a subsequent shooting to establish defendant's identity was admissible under 404(b), SCRE, as the evidence from the shooting was logically related to the instant case). This evidence clearly aids in establishing the identity of the person who committed the robbery at the McDonald's. Further, the circuit court limited the prejudicial impact of the testimony when it ruled that the State could not question the police on the details of the home invasion, its pursuit of Simmons into the woods, his capture, or the fact that he was seriously

---

4. Lieutenant Corley misspoke because the apprehension actually occurred on May 24, 2004.

bleeding and required hospitalization after his arrest. As such, the circuit court's admission of this testimony did not violate Rule 404(b), SCRE.

## B. Blood Evidence

Simmons objected at the pre-trial hearing to the State introducing evidence of his blood on the rims, arguing he bled after the Kershaw County case and not in connection with the McDonald's robbery. The circuit court overruled this objection, finding that the fact the stolen rims were on Simmons's vehicle and that his blood was on the rims were probative of whether Simmons committed the McDonald's robbery.

Simmons contends that the prejudicial value of the blood evidence from the stolen rims outweighs its probative value because it suggests that he is a dangerous criminal and was involved in a bloody unrelated crime in Kershaw County. However, we find the circuit court properly limited the scope of the testimony to prevent Simmons from being unduly prejudiced. The jury was never instructed that Simmons was bleeding when he was arrested or that the blood on the rims was a result of the Kershaw County home invasion, so it could plausibly accept the State's theory that Simmons's blood was on the rims because he cut himself when trying to install them on the tires. *See Cammer v. Atl. Coast Line R. Co.*, 214 S.C. 71, 81, 51 S.E.2d 174, 178 (1948) (holding that the tasks of resolving contradictions in evidence, determining witnesses credibility, and deciding what testimony to accept when resolving a case are all left to the jury as fact-finder).

Furthermore, while the blood evidence was prejudicial, it was not unduly so, as it was probative in identifying Simmons as the perpetrator in the McDonald's robbery. *See Dickerson,* 341 S.C. at 400, 535 S.E.2d at 123 ("Unfair prejudice means an undue tendency to suggest decision on an improper basis."); *See Stokes,* 381 S.C. at 406, 673 S.E.2d at 442 (finding that evidence of a gun in another crime was probative of identity under Rule 404(b), SCRE, and while it was prejudicial, it was not "unduly prejudicial," as the weapon from other crime linked defendant to gun in instant case). The evidence was not offered to show Simmons's bad character, but rather, it was introduced to connect Simmons to the rims on the Pontiac

Sunfire that were stolen from the McDonald's parking lot. *Id.* (finding evidence of weapon from subsequent shooting was admissible under Rules 404(b) and 403, despite defendant's contention that it implied "he might be a violent person who may possess a gun," as the weapon connected him to the prior crime). Consequently, the circuit court did not err in admitting the limited testimony regarding the blood evidence from the stolen rims.

## II. Voluntariness of Statements during Custody

Simmons next maintains that his statements to the police while in custody were not freely and voluntarily given because they were the product of police coercion. We disagree.

To determine the voluntariness of a statement, the circuit court must first conduct an evidentiary hearing, outside the presence of the jury, where the State must show the statement was voluntarily made by a preponderance of the evidence. *State v. Miller*, 375 S.C. 370, 379, 652 S.E.2d 444, 448 (Ct.App.2007). During this hearing, the circuit court must examine the totality of circumstances surrounding the statement and determine whether the State has carried its burden of proving the statement was given voluntarily. *Id.* at 382, 652 S.E.2d at 450. If the statement is found to have been given voluntarily, it is then submitted to the jury where its voluntariness must be established beyond a reasonable doubt. *State v. Washington*, 296 S.C. 54, 56, 370 S.E.2d 611, 612 (1988). On appeal, the circuit court's decision as to the voluntariness of the statement will not be reversed unless so erroneous as to demonstrate an abuse of discretion. *Miller*, 375 S.C. at 378, 652 S.E.2d at 448.

Simmons claims that the police's coercive and threatening actions in conjunction with the promise of food and leniency improperly induced him to make incriminatory statements. To the contrary, the totality of circumstances surrounding his statements demonstrates Simmons made a knowing and voluntary waiver of his rights. Chief Wilson testified that before Simmons was questioned on any details pertaining to the robbery, he read Simmons his *Miranda* rights from a standard form, which included Simmons's right to counsel. Chief

Wilson stated that Simmons verbally agreed to waive his rights, but he was not asked to sign a waiver of rights form. Although the police did not require Simmons to sign a waiver of rights form, this does not necessarily negate the voluntary nature of Simmons's statements. *Cf. State v. Doby*, 273 S.C. 704, 708, 258 S.E.2d 896, 899 (1979) (signing of a waiver of rights form is not conclusive as the State must still prove a knowing and voluntary waiver). After Chief Wilson read Simmons his rights, Simmons stated that "he was familiar with how the system worked," which indicates he was aware of his constitutional rights.[5] While Simmons argues he repeatedly requested counsel during this time, both Chief Wilson and Captain Smith testified to the contrary. The circuit court ruled that while Simmons may have told his father and brother that he wanted counsel, no evidence or testimony existed to substantiate this assertion, and Simmons failed to establish that his request for counsel was relayed to the police. Based on the evidence, the circuit court properly exercised its discretion in finding the officers' testimony more credible than that of Simmons in making its voluntariness determination.

Simmons's contention that he was induced by the promise of food is unpersuasive as not even Simmons disputes that he ate *before* discussing the details of the McDonald's robbery. At trial, Chief Wilson testified that Simmons complained of hunger while giving his palm print, so he promptly requested food for Simmons. Further, the four-hour time frame between the initial meal and his subsequent incriminatory statements was not so great as to reasonably lead to the conclusion that hunger played a role in making the statements. Chief Wilson and Sergeant Barnes stated that the police complied with Simmons's subsequent requests for food and drink. Addition-

---

5. Simmons argues that Chief Wilson's statement should have been excluded because it was not introduced at the *Jackson v. Denno* hearing, and the statement inferred that he had a prior criminal history. Chief Wilson's statement was not prejudicial to Simmons as it was not the focus of his testimony, and the State never attempted to introduce any prior criminal convictions to emphasize why Simmons would have knowledge of the "system." *See State v. Robinson*, 238 S.C. 140, 151, 119 S.E.2d 671, 675–76 (1961) (finding reference to defendant's past conduct was not prejudicial because even if the testimony created the inference in the jury's mind that the accused had committed another crime, the State never attempted to prove the accused had been convicted of some other crime) (overruled on other grounds).

ally, while Simmons was eating, he requested to speak with his family before discussing the robbery with the police. Chief Wilson agreed and permitted Simmons to speak with his family members on the phone, who then came to police headquarters and spoke privately with Simmons for approximately thirty minutes. It was not until *after* Simmons spoke with his family that he viewed the McDonald's robbery videotape and identified himself as the perpetrator.

Simmons also argues that he was induced into making incriminatory statements by the solicitor's promise of leniency and by coercive police tactics. A statement may not be "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] obtained by the exertion of improper influence." *Miller*, 375 S.C. at 386, 652 S.E.2d at 452 (internal citation omitted). A statement "induced by a promise of leniency is involuntary only if so connected with the inducement as to be a consequence of the promise." *Id.* (internal citation omitted).

The circumstances surrounding Simmons's statement fail to establish that his statements were induced by any promises of leniency or by coercive police activity. Before Simmons viewed the videotape, and while his family was still present, deputy solicitor John Meadors entered Chief Wilson's office and advised Simmons and his family that if Simmons cooperated, "it would be considered at sentencing." This was not improper. *See id.*, 375 S.C. at 387, 652 S.E.2d at 453 (finding that police officers' and assistant attorney general's statements to defendant that it was in "his best interests to cooperate" were not improper where no one made any direct or implied promises of leniency). Chief Wilson denied promising Simmons anything at any point during their conversations. Chief Wilson and Captain Smith stated no one threatened or coerced Simmons into speaking with the police. Further, when Simmons later identified himself as the robber, he was sitting in Captain Smith's office where he was not restrained or handcuffed in any manner. Moreover, the police provided Simmons with an opportunity to not only call but also privately consult with his family prior to discussing the robbery. *Cf. State v. Franklin*, 299 S.C. 133, 138, 382 S.E.2d 911, 914 (1989) (acknowledging that a statement induced by the police by

preying upon a defendant's concern for or desire to contact his family must be excluded from evidence as involuntary). While Simmons argues the police's response to his initial refusal to give his palm print intimidated him into later making incriminatory statements, the intervening events, including the reading of his *Miranda* rights and consultation with his family, and the lapse of time prevented any prior confrontation from reasonably influencing his decision to speak with police.[6]

■ Further, in determining whether Simmons voluntarily made the statements, the circuit court properly considered the credibility of the witnesses, as it must. *See Miller*, 375 S.C. at 387, 652 S.E.2d at 453 (finding that in a *Jackson v. Denno* hearing, the circuit court has the opportunity to listen to the testimony, assess the demeanor and credibility of all witnesses, and weigh the evidence accordingly). Simmons contradictorily argues on appeal that he was coerced into making incriminatory statements, yet he also testified in camera that he never identified himself as the robber in the McDonald's videotape; he never watched the videotape; he was never read his *Miranda* rights; he never waived his rights; and his requests for counsel were denied. All of Simmons's assertions directly conflict with the police's testimony. As such, the

---

6. Simmons additionally contends that the circuit court erred in admitting his conversation with Sergeant Barnes while being transported to the detention center, specifically Simmons's statement that the "chase" was "fun while it lasted." At the in camera hearing, the circuit court redacted several statements from Sergeant Barnes's testimony but found that since Barnes's statements were produced in discovery, the State would be allowed to pursue this line of questioning unless Simmons could establish unfair prejudice. Based upon the facts and circumstances of the case, we find Simmons's statement to Barnes was voluntarily given and thus admissible at trial. *See State v. Smith*, 259 S.C. 496, 499, 192 S.E.2d 870, 871 (1972) ("[T]he question of whether *Miranda* warnings, having been once given, should be repeated at later stages of the interrogation must be determined upon the basis of the facts and circumstances surrounding each case."). Simmons had first waived his *Miranda* rights approximately four hours beforehand and had not told police since that time that he wanted to remain silent. We believe the relatively short lapse of time between the initial *Miranda* warnings and his subsequent incriminatory statement was not too attenuated to require Sergeant Barnes to reread Simmons's rights to him. *See State v. Bailey*, 714 S.W.2d 590 (Mo.App.1986) (finding that questioning after a break was not a second interrogation so as to require a fresh set of *Miranda* warnings because mere lapse of time does not require exclusion of subsequent incriminatory statements).

circuit court did not abuse its discretion in giving greater weight to the officers' testimony in its voluntariness determination based on Simmons's inconsistent testimony of what transpired while in custody. *See id.* (upholding the circuit court's determination of voluntariness despite defense attorney's statement that defendant was coerced into making a statement by a promise of a lenient sentence when three law enforcement officials and an assistant attorney general denied any promise of leniency). Consequently, it was proper to allow the jury to ultimately decide the voluntariness of Simmons's statements as the State proved by a preponderance of the evidence that his statements were not induced by any promises of leniency. *See State v. Von Dohlen,* 322 S.C. 234, 243, 471 S.E.2d 689, 695 (1996) (finding that once the circuit court determines that the statement is admissible, it is up to the jury to ultimately determine whether the statement was voluntarily made).

## III. Eyewitness Testimony

Simmons claims that the circuit court erred in permitting three employees who witnessed the robbery to testify about Simmons's identity because their identifications were tainted and unreliable. We disagree.

The admission of evidence is within the sound discretion of the circuit court. *State v. Tucker,* 319 S.C. 425, 428, 462 S.E.2d 263, 265 (1995). Accordingly, a circuit court's decision to allow the in-court identification of an accused will not be reversed absent an abuse of discretion or prejudicial legal error. *State v. Govan,* 372 S.C. 552, 556, 643 S.E.2d 92, 94 (Ct.App.2007).

An in-court identification of an accused is inadmissible if a suggestive out-of-court identification procedure created "a very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). An identification may be reliable under the totality of circumstances even when a suggestive procedure has been used. *State v. Brown,* 356 S.C. 496, 503, 589 S.E.2d 781, 784 (Ct.App.2003) (internal citation omitted). To determine whether an identification is reliable, it is necessary to consider the following factors: (1) the opportunity of

the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the amount of time between the crime and the confrontation. *Id.* at 504, 589 S.E.2d at 785.

### a. L'Marshalett Moore and Sophia Thomas

Simmons argues the circuit court erred in admitting L'Marshalett Moore's and Sophia Thomas's in-court identifications because the out-of-court photographic line-ups were unduly suggestive and unreliable. We disagree.

At trial, Ms. Moore testified that when she encountered Simmons, she was able to get a good look at his face and described him as being tall and brown-skinned with a slim face and small ears. She also stated that she was very close to Simmons during the robbery because he held a gun to her face and that she had an opportunity to look at his face for approximately three or four minutes in the store where the lighting was "bright." Ms. Moore testified that at one point she had a "perfect view" of Simmons's face. When questioned, Ms. Moore stated that she again observed Simmons's face after he forced her and other employees into the restaurant's cooler and that the lights were on in the cooler during this time.

Additionally, Ms. Thomas also testified that when she encountered Simmons on the morning of the robbery, he pointed the gun directly at her face, took her purse, and forced her into the restaurant's cooler. In identifying Simmons, she stated that she was in a well-lit area within a few feet of him at the time that she got a "good look" at his face. She further stated nothing obstructed her view of Simmons's face, she could clearly see a "front view" of his face, and she was able to look at him for several seconds. Ms. Thomas described Simmons to police as a skinny, black male who was approximately her height.

After the robbery, the police presented several McDonald's employees, including Ms. Moore and Ms. Thomas, with two sets of photo line-ups. Simmons's picture was not present in either of these line-ups, and neither Ms. Moore nor

Ms. Thomas identified anyone in either instance.[7] It was not until the third photo line-up, which contained Simmons's picture, that Ms. Moore and Ms. Thomas made a positive identification. Both witnesses testified that they did not discuss the line-up with anyone and that no one told them whom to pick. Ms. Moore stated she identified Simmons because of his ears, whereas Ms. Thomas testified she identified him because of his face.

Based on the totality of the circumstances, we find the in-court identifications were admissible. Despite Simmons's contention that his ears were smaller than those of the other individuals in the line-up, his photograph does not stand out in such a way as to render the line-up unduly suggestive. *See State v. Turner*, 373 S.C. 121, 127, 644 S.E.2d 693, 696–99 (2007) (finding photo line-up was admissible, despite defendant's assertion that it was unduly suggestive due to variations in the background colors on certain photos in the line-up); *State v. Washington*, 323 S.C. 106, 112, 473 S.E.2d 479, 482 (Ct.App.1996) (upholding in-court eyewitness identification of defendant based on totality of circumstances, despite defendant's objection to the dark background in photo line-up and defendant's claim that he was the only individual in line-up with a medium length afro-style haircut); *State v. Roberts*, 135 N.C.App. 690, 522 S.E.2d 130, 133 (1999) (finding photo line-up was not unduly suggestive, despite defendant being the only individual in the line-up with freckles and a light complexion as "defendant's own unique physical appearance was what rendered him conspicuous in the lineup, not any suggestive police procedures"). Both eyewitness identifications were

---

7. Simmons argues that the circuit court erroneously admitted testimony from police officers who stated that certain eyewitnesses were shown lineups but were unable to identify Simmons as the robber. Simmons contends this testimony constituted inadmissible hearsay as it amounted to improper bolstering under Rule 801, SCRE, and it violated *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Even if the police testimony was hearsay, the testimony was harmless error that could not have reasonably affected the outcome of the trial as none of the witnesses identified Simmons as the perpetrator. Consequently, Simmons's conviction should not be set aside on this ground because he was not prejudiced by the admission of this testimony. *State v. Knight*, 258 S.C. 452, 454, 189 S.E.2d 1, 2 (1972) ("[A] conviction will not be reversed for nonprejudicial error in the admission of evidence.").

properly based on their own memories of Simmons's face, which were reconfirmed upon viewing Simmons's photo in the line-up. *See State v. Davis,* 309 S.C. 326, 339, 422 S.E.2d 133, 142 (1992) (finding that photo line-up was not tainted even though victim had opportunity to look at sketch of suspect prior to making identification because the victim had her own visual sketch of suspect based on her memory of his face and clothing) (overruled on other grounds).

Were we to conclude for the sake of argument that the photographic line-up was unduly suggestive because of Simmons's ears, the State still presented sufficient evidence to establish that both Ms. Moore and Ms. Thomas made reliable identifications. *See State v. Blassingame,* 338 S.C. 240, 251, 525 S.E.2d 535, 541 (Ct.App.1999) ("Reliability is the linchpin in determining the admissibility of identification testimony."). First, both witnesses testified that they had an opportunity to directly view Simmons's face during the robbery in a well-lit area. Second, because of their close proximity to Simmons in addition to the fact that he was holding a gun directly in their face, the witnesses undoubtedly possessed a heightened degree of attention. Third, both witnesses' descriptions of Simmons were accurate. While Ms. Moore may have focused on Simmons's ears in recollecting his identity and Ms. Thomas was unsure whether Simmons had facial hair on his chin on the day of the robbery, this does not discredit their identifications as they were accurate "on the whole." *See State v. Mansfield,* 343 S.C. 66, 79–80, 538 S.E.2d 257, 264 (Ct.App. 2000) (finding eye witness identification "on the whole was accurate" even though the witness described the perpetrator as having plaits in his hair and wearing tennis shoes while the defendant actually had an afro and wore boots).

Fourth, both witnesses were certain when they identified Simmons. At trial, Ms. Moore stated that she was "positive" that the person she identified in the line-up as the robber was Simmons, and Ms. Thomas testified that she had "no doubt" in her mind that Simmons was the robber after viewing the photographic line-up. *See Washington,* 323 S.C. at 112, 473 S.E.2d at 482 (upholding in-court eyewitness identification when eyewitness testified that defendant "best resembled" the robber); *State v. Patrick,* 318 S.C. 352, 357,

457 S.E.2d 632, 635–36 (Ct.App.1995) (finding no abuse of discretion in admission of identification when the victim was with the perpetrator under "well-lighted conditions," the victim testified she looked at him carefully, and she observed another trial involving the defendant and immediately knew the defendant "was the one"). Finally, the lapse of one month between the crime and the photographic line-up was not so great that either witness's identification would be unreliable, particularly given the foregoing factors that indicate the reliability of the identifications. *See State v. McCord,* 349 S.C. 477, 482–83, 562 S.E.2d 689, 692 (Ct.App.2002) (upholding admission of victim's in-court identification several years after sexual assault and citing *Commonwealth v. Wilson,* 538 Pa. 485, 649 A.2d 435, 445 (1994), wherein the court found no error in admission of in-court identification occurring six and one-half years after the alleged crime). Based on the totality of circumstances, the circuit court did not err in allowing the in-court identifications.

### b. Dawn Richmond

Simmons next asserts that the circuit court erred in permitting Dawn Richmond to testify regarding the photographic line-up and in refusing to declare a mistrial when she once referenced the robber as the "defendant" when recalling comments the robber made to her during the robbery. We disagree.

Ms. Richmond testified at the in camera hearing she could not give police a definite answer as to whether the robber was in the line-up, but the second photograph in the line-up, which was Simmons's picture, "looked like" the robber. Ms. Richmond also testified that the store was well-lit and that even though she only saw his face for a few seconds, she got a good look at it. When she later attended the bond hearing for the robbery, Ms. Richmond stated that she saw Simmons, and while no one told her he was the robber, there was no doubt in her mind at that point that he robbed the McDonald's. The circuit court did not allow her to make an in-court identification, finding her identification at the bond hearing was unduly suggestive and would not serve as a proper basis for an in-court identification.

At trial, she testified that after looking at the six photographs in the line-up, she selected the second photograph

because it looked like the robber, although she was not 100% certain. Ms. Richmond also stated that if she had seen a side view of the robber, she could have positively identified him. When asked why she did not look at him directly, she replied that "the defendant" told her not to look at him. Simmons did not make a timely objection in response to her statement. It was not until after Ms. Richmond finished testifying that Simmons objected to her referencing him as "the defendant" and requested a mistrial on that ground. The circuit court denied Simmons's motion for a mistrial, finding Ms. Richmond's statement was "an inadvertent reference" that did not warrant declaring a mistrial. The court, however, agreed to give a curative instruction to the jury.

Ms. Richmond's observations during the course of the robbery were properly admitted at trial. Despite the fact that Ms. Richmond lacked absolute certainty in identifying Simmons as the robber, our courts have upheld identifications by an eyewitness who was not absolutely certain of the perpetrator's identity. In *State v. Washington*, 323 S.C. 106, 111, 473 S.E.2d 479, 481 (Ct.App.1996), this Court held that an eyewitness's signed statement that the defendant "best resembled" the person who attempted to rob the eyewitness was admissible as an out-of-court identification. Further, the eyewitness's in-court identification was admissible, despite his testimony on direct that there was "no question" defendant was the robber. *Id.* at 112, 473 S.E.2d at 482. This Court found the eyewitness's in-court identification was reliable because "the jury had the opportunity to observe the witness and attach the credibility it deemed proper to his testimony, including the certainty or uncertainty of his identification...." *Id.* In a similar vein, Ms. Richmond testified that when she was presented with the photographic lineup, she pointed to Simmons's photograph and said he looked like the robber but because of the angle of the picture, she was not 100% certain. Even if her identification was not reliable enough to be the basis for an in-court identification, the jury was capable of weighing her statements according to the degree of certainty or uncertainty she possessed when identifying the robber in the photographic line-up.

In any event, Ms. Richmond's testimony was harmless because it was cumulative to other overwhelming evidence

that established Simmons's guilt. *See State v. Blackburn*, 271 S.C. 324, 329, 247 S.E.2d 334, 337 (1978) (finding the admission of improper evidence is harmless when the evidence is merely cumulative to other evidence). The other eyewitness testimony in conjunction with the stolen rims, videotape surveillance, DNA and palm print evidence, and Simmons's own statements while in custody conclusively prove his guilt, regardless of Ms. Richmond's testimony. *See State v. Bryant*, 369 S.C. 511, 518, 633 S.E.2d 152, 156 (2006) (holding that an insubstantial error not affecting the result of the trial is harmless when a defendant's guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached).

 Simmons also claims that the circuit court erred in denying his motion for a mistrial in response to Ms. Richmond referencing the robber as "the defendant" during her testimony. This issue is not preserved for our review. *State v. Vanderbilt*, 287 S.C. 597, 598, 340 S.E.2d 543, 544 (1986) (finding an issue which is not properly preserved cannot be raised for the first time on appeal). Simmons failed to make a contemporaneous objection, which is required to preserve an issue for appellate review. *See State v. Torrence*, 305 S.C. 45, 51, 406 S.E.2d 315, 319 (1991) (stating a contemporaneous objection is required to properly preserve an error for appellate review); *State v. Rice*, 375 S.C. 302, 323, 652 S.E.2d 409, 419 (Ct.App.2007) (holding that for an objection to be timely, it must be made at the time that evidence is offered).[8]

## IV. Violation of Sequestration Order

 Simmons claims that the circuit court erred by allowing Captain Smith to testify at trial because he violated the court's sequestration order. We disagree.

---

**8.** Regardless of the timeliness of defense counsel's objection, the circuit court gave a curative instruction, which cured any potential error. *See State v. Walker*, 366 S.C. 643, 658, 623 S.E.2d 122, 129 (Ct.App.2005) ("Generally, a curative instruction is deemed to have cured any alleged error."). Further, Simmons did not object to any insufficiencies in the circuit court's curative instruction. *See State v. George*, 323 S.C. 496, 510, 476 S.E.2d 903, 912 (1996) (finding an issue is not preserved for appellate review if the objecting party accepts the court's ruling and does not contemporaneously make an additional objection to the sufficiency of the curative charge or move for a mistrial).

The circuit court may order the sequestration of witnesses upon its own motion or by motion of any party. *See* Rule 615, SCRE. A party is not entitled to have witnesses sequestered as a matter of right. *State v. Tisdale*, 338 S.C. 607, 616, 527 S.E.2d 389, 394 (Ct.App.2000). Rather, the decision to sequester witnesses is left to the sound discretion of the circuit court. *State v. LaBarge*, 275 S.C. 168, 171, 268 S.E.2d 278, 280 (1980); *see also State v. Fulton*, 333 S.C. 359, 375, 509 S.E.2d 819, 827 (Ct.App.1998) (allowing the State to recall a reply witness who was present in the courtroom during a portion of the trial). Whether to exempt a witness from a sequestration order is within the circuit court's discretion. *Tisdale*, 338 S.C. at 616, 527 S.E.2d at 394.

During the *Jackson v. Denno* hearing, Simmons's counsel moved to sequester all testifying witnesses, and the circuit court granted this request. Shortly thereafter, Simmons's counsel objected to Captain Smith's presence in the courtroom during Chief Wilson's in camera testimony. The State responded that Captain Smith was the chief investigating officer, and his presence was essential to the presentation of the State's case. The circuit court ruled that while Captain Smith could be present during the trial, he would need to step out during Chief Wilson's testimony, at which time Captain Smith left the courtroom.

Later, Captain Smith, who was to testify after Simmons at the pre-trial hearing, entered the courtroom during Simmons's testimony. Simmons's counsel again objected to Captain Smith's presence, and, in response, the State noted that Captain Smith was not present for Chief Wilson's testimony. The circuit court responded that because Smith had been "back and forth," it did not know what Smith heard while in the courtroom; however, Smith would still be allowed to testify. When questioned by Simmons's counsel, Smith stated he entered the courtroom during Simmons's testimony, but only because he was "sent for" to testify.

The circuit court did not abuse its discretion in permitting Smith to testify, despite Captain Smith's presence in the courtroom during other witnesses' in camera testimony. First, no evidence was presented to establish that Smith knowingly and intentionally entered the courtroom in an effort to violate the order. While Smith was present for the begin-

ning of Chief Wilson's in camera testimony, Smith promptly left the courtroom after the court instructed him to leave. Furthermore, Captain Smith was only present for the small portion of Chief Wilson's in camera testimony to which he was not a witness during Simmons's initial interrogation, so any of Chief Wilson's statements that Captain Smith may have heard could not have influenced his subsequent testimony. While Captain Smith admitted to being present during Simmons's testimony, Captain Smith testified that he entered the courtroom only because he was "sent for" as he was the next witness to testify. Moreover, Captain Smith affirmed that his in camera testimony reflected and summarized his notes from Simmons's interrogation, and Simmons does not attempt to highlight any inconsistencies between Captain Smith's notes and his testimony as a result of Captain Smith's presence during Chief Wilson's and Simmons's in camera testimony. Therefore, the circuit court did not abuse its discretion in permitting Captain Smith to testify at trial.

### V. Admissibility of Second Palm Print

Simmons also asserts that the circuit court erred in requiring Simmons to give a second palm print at trial when the court previously ruled that the police had improperly obtained the first palm print during Simmons's custody in Richland County. We disagree.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. Const. Amend. IV. A court order that allows the government to procure evidence from a person's body constitutes a search and seizure under the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767–70, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *State v. Register*, 308 S.C. 534, 537, 419 S.E.2d 771, 772 (1992). The Fourth Amendment protects against intrusions into the human body for the taking of evidence absent a warrant unless there are exigent circumstances, such as the imminent destruction of evidence. *Schmerber*, 384 U.S. at 770, 86 S.Ct. 1826; *see also State v. Dupree*, 319 S.C. 454, 460, 462 S.E.2d 279, 282–83 (1995) (applying *Schmerber* analysis to search of suspect's mouth).

Section 17–13–140 of the South Carolina Code (2003) provides for the involuntary submission of nontestimo-

nial identification evidence. *In re Snyder,* 308 S.C. 192, 196, 417 S.E.2d 572, 574 (1992); *Register,* 308 S.C. at 537, 419 S.E.2d at 772. When the State seeks nontestimonial identification evidence from arrested or unarrested suspects, constitutional requirements mandate that the State prove it has probable cause before the circuit court will permit the acquisition of such evidence. *Baccus,* 367 S.C. at 54, 625 S.E.2d at 223. Following these constitutional requirements, section 17–13–140 requires a sworn affidavit for a search warrant to be issued. *Id.* at 54, 625 S.E.2d at 223. Under section 17–13–140, a court order may stand in place of a search warrant for purposes of procuring nontestimonial evidence. *Id.* at 55 n. 3, 625 S.E.2d at 223 n. 3 (reiterating that as previously held in *Snyder* and *Register,* a court order may be issued under section 17–13–140 instead of a search warrant). Like a search warrant, a court order requiring a person to produce nontestimonial evidence should only be issued upon a finding of probable cause, which is supported by oath or affirmation. *Id.* at 54–55, 625 S.E.2d at 223

To establish probable cause, the State must establish the following three elements: (1) probable cause to believe the suspect has committed the crime; (2) a clear indication that relevant material evidence will be found; and (3) the method used to secure it is safe and reliable. *Id.* at 54, 625 S.E.2d at 223; *see also Register,* 308 S.C. at 538, 419 S.E.2d at 773. Additional factors to be weighed are the seriousness of the crime and the importance of the evidence to the investigation. *Register,* 308 S.C. at 538, 419 S.E.2d at 773. The circuit court is required to balance the necessity for acquiring involuntary nontestimonial identification evidence against constitutional safeguards prohibiting unreasonable bodily intrusions, searches, and seizures. *Id.*

Simmons objected at the pre-trial hearing to the admission of the palm print that was taken when he was initially detained in Richland County, arguing it was taken by force, without a warrant, and without exigent circumstances. In response, the State argued that a search warrant was unnecessary because Simmons consented to give his palm print. Despite the State's argument, the circuit court found that the State failed to establish probable cause existed to take Simmons's palm print, particularly when he had neither been

served with a search warrant nor placed under arrest in Richland County. As a result, the circuit court excluded the first palm print.

The State immediately moved for a *Schmerber* [9] hearing. In response, Simmons argued the State's attempt to take Simmons's palm print was untimely because the State was essentially investigating its case during the course of trial as the jury was already impaneled, but the circuit court allowed arguments on the issue. After hearing arguments from both sides, the circuit court found the State presented probable cause to take Simmons's palm print.

Regardless of the admissibility of the first palm print, the court's order requiring Simmons to submit to the second palm print was proper as the State established probable cause for the acquisition of the palm print evidence by satisfying the three-prong test for acquiring nontestimonial identification evidence. *See Register*, 308 S.C. at 538, 419 S.E.2d at 773. First, based on other inculpatory evidence and testimony, probable cause existed to show Simmons committed the McDonald's robbery. Second, Simmons's palm print was needed to determine whether his palm print matched the palm print lifted from the stolen Pontiac Sunfire; thus, it was necessary, material, and relevant evidence. Last, the method used to procure his palm print was safe and reliable, and it was the least intrusive means of obtaining this evidence. Also, as is required for a court order to procure nontestimonial evidence, the witnesses were under oath while giving testimony to establish probable cause pursuant to the United States and South Carolina constitutions. *See* U.S. Const. amend. IV; S.C. Const. art. I, § 10; *see also Baccus*, 367 S.C. at 54, 625 S.E.2d at 223. As such, the circuit court's order requiring Simmons to submit to a second palm print was proper.[10]

Simmons additionally argues that regardless of whether probable cause existed, the circuit court erred in allowing the State to continue to investigate its case in the middle of trial.

---

**9.** Pursuant to *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the circuit court may issue an order that allows the State to procure evidence from a person's body if the State can establish probable cause for the acquisition of such evidence.

**10.** While not controlling authority, we find the case of *State v. Ostroski,* 201 Conn. 534, 518 A.2d 915 (1986), to be instructive. In that case, the

The crux of Simmons's argument appears to be that introduction of this evidence created unfair surprise that ultimately prejudiced him. However, as the circuit court noted, Simmons failed to establish that he was unfairly surprised when the initial palm print was taken over two years prior to trial and had been produced early in the discovery process. Because Simmons had notice prior to trial that the State possessed this inculpatory evidence, it was reasonable to believe that this evidence might be used in the State's case against him if it were found admissible.

Furthermore, while the jury had been impaneled, it had not been sworn in when the court made its ruling, so Simmons's claim that this ruling permitted the State to investigate its case in the *middle* of trial is inaccurate. Even if the trial had begun, there is authority from other states which condones the taking of a defendant's prints during trial. *See Carter v. State*, 485 So.2d 1292, 1295 (Fla.Dist.Ct.App.1986) (finding that the circuit court properly may order the State to take a defendant's fingerprints during trial without violating the defendant's constitutional rights when the court requires that notice be given to the defendant and that the fingerprints be taken at a reasonable time and place); *Sloane v. State*, 507 S.W.2d 747, 749 n. 1 (Tex.Crim.App.1974) (finding defendant's fingerprint that was taken during trial was properly admitted into evidence); *Martin v. State*, 463 S.W.2d 449, 451 (Tex. Crim.App.1971) (holding that taking defendant's fingerprints, over objection, just prior to jury selection was not error). As a result, the circuit court did not commit error in admitting the second palm print into evidence.

---

State had illegally obtained a palm print and a blood sample from the defendant, both of which were inadmissible at trial because of fourth amendment violations. *Id.* at 542, 518 A.2d 915. Citing to *Bynum v. U.S.*, 274 F.2d 767 (D.C.Cir.1960), the court found that the inadmissibility of the initial palm print and blood sample did not preclude the State from acquiring, through an untainted source, a second palm print and blood sample. *Id.* The court allowed the second palm print and blood sample to be introduced at trial because the State established probable cause for acquiring the nontestimonial evidence pursuant to *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The court also supported its reliability determination by noting that the evidence could not have been practically obtained from another source, and it was material in determining whether the defendant committed the crime. *Id.* at 552–53, 518 A.2d 915.

## VI. Jury Charge

 Simmons avers that the circuit court erred in its reasonable doubt instruction when it told the jury they could not acquit Simmons unless there was a "real possibility" that he was not guilty. He contends the instruction lessened the State's burden of proving his guilt beyond a reasonable doubt. We disagree.

 In reviewing jury charges for error, this Court must consider the circuit court's jury charge as a whole in light of the evidence and issues presented at trial. *Keaton ex rel. Foster v. Greenville Hosp. Sys.,* 334 S.C. 488, 497, 514 S.E.2d 570, 575 (1999) (internal quotations and citations omitted). If, as a whole, the charges are reasonably free from error, isolated portions which might be misleading do not constitute reversible error. *Id.* A jury charge is correct if, when the charge is read as a whole, it contains the correct definition and adequately covers the law. *Id.* at 495–96, 514 S.E.2d at 574 (internal quotations and citations omitted). To warrant reversal, a circuit court's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant. *State v. Patterson,* 367 S.C. 219, 232, 625 S.E.2d 239, 245 (Ct.App.2006).

The circuit court gave the following jury instruction, in relevant part:

> If based on your consideration of the evidence you are firmly convinced that the defendant is guilty of the crimes charged, you must find the defendant guilty. If on the other hand, you think there is a real possibility that the defendant is not guilty, you must give the defendant the benefit of the doubt and find the defendant not guilty.

This charge was not in error. The Supreme Court approved an almost identical reasonable doubt instruction in *State v. McHoney,* 344 S.C. 85, 98, 544 S.E.2d 30, 36–37 (2001), and in *State v. Darby,* 324 S.C. 114, 116, 477 S.E.2d 710, 711 (1996).

The Supreme Court in *McHoney* approved the following jury instruction:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. . . . If based upon

your consideration of the evidence you are firmly convinced that the defendant is guilty of the crime charged, then you must find him guilty. *If on the other hand you think there is a real possibility that he is not guilty, you must give him the benefit of that doubt and find him not guilty.*

344 S.C. at 98, 544 S.E.2d at 36 (emphasis in original). Citing to *Darby,* the Supreme Court reiterated that "[c]ourts specifically addressing whether the 'real possibility' language lessens the government's burden of proof have held it does not in the context of the preceding language requiring that the juror be 'firmly convinced' of the defendant's guilt." *Id.* at 98, 544 S.E.2d at 36–37 (internal citation omitted).

As in *McHoney* and *Darby,* nothing in the circuit court's reasonable doubt instruction suggests that Simmons bears the burden of proof. *See id.* at 98, 544 S.E.2d at 36; *Darby,* 324 S.C. at 116, 477 S.E.2d at 711. Moreover, the Supreme Court approved of the "real possibility" language in *State v. Needs,* 333 S.C. 134, 155 n. 12, 508 S.E.2d 857, 868 n. 12 (1998), and this Court also approved this language in *State v. Lowery,* 332 S.C. 261, 265, 503 S.E.2d 794, 796–97 (Ct.App.1998). As such, Simmons's claim of error on this ground is without merit.

## CONCLUSION

Based on the foregoing, the decision of the circuit court is **AFFIRMED.**

SHORT and THOMAS, JJ., concur.