720 S.E.2d 62

**In the Interest of JAMAL G., a Juvenile Under the Age of Seventeen, Appellant.**

**No. 4913.**

Court of Appeals of South Carolina.

Heard Oct. 6, 2011.
Decided Nov. 23, 2011.
Rehearing Denied Jan. 30, 2012.

Chief Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John McIntosh, Assistant Attorney General Salley W. Elliott, Assistant Attorney General Alphonso Simon, Jr., all of Columbia, and Scarlett Anne Wilson, of Charleston, for Respondent.

LOCKEMY, J.

In this appeal from the family court involving a juvenile criminal matter, Jamal G. contends the family court erred in failing to reduce the charge of murder to the lesser charge of voluntary manslaughter. We find this issue is not preserved for our review.

## FACTS

Around 6 p.m. on February 10, 2008, Jamal G. (Jamal), Terrell W.,[1] and Jamal's brother (Michael) were outside a neighborhood convenience store. Around the same time, Trammel (Victim), Victim's younger brother (Telvin), and their uncle (Troy), were standing in a yard a few houses away from the store.

Kim, one of the state's witnesses, testified to an ongoing dispute between Telvin and Terrell's brother (Timmy). Jamal called Telvin a derogatory name in front of Kim and a few other witnesses, and then asked Brittany Lesston if she would call Telvin to the store. Kim stated Jamal and Terrell indicated they were going to take care of "Timmy's business." Kim said she interpreted one of Jamal's statements to mean Jamal and Terrell could beat Telvin in a fight one on one. Kim then walked over to Victim, Telvin, and Troy and told them to ignore Jamal and Terrell. However, Victim stated he was going to "squash this right now." Kim said Victim went to Terrell trying to be a peacemaker, but Terrell became agitated, at which point Telvin ran over and started fighting with Terrell. Kim heard Jamal tell Terrell to "chill," but Terrell took a gun from Jamal's person and fired it once. Subsequently, Kim saw Jamal get the gun back from Terrell, and she watched Jamal shoot the gun multiple times. Kim stated she then saw the victim collapse, but she did not know who fired the shot that hit Victim. During cross-examination Kim testified the victim did not attempt to break up the fight between Telvin and Terrell, he was observing.

Brittany Lesston confirmed that Jamal asked her to call and ask Telvin to come to the corner store, however, she refused Jamal's request. Brittany also testified that Telvin and Terrell fought, and she heard Terrell yell, "Give me the f-ing gun." Brittany states there was a "scuffle" between Victim, Telvin, Jamal, Terrell, and three other men when she heard one shot, then multiple shots after that.

Condenia Lesston testified Terrell yelled expletives at Telvin for not coming out of his yard to fight. At that point, Victim "calmly" walked out to speak with Terrell. She ob-

---

1. Terrell was charged as a co-defendant in this case.

served Terrell become agitated with Victim, and then Telvin came out and began fighting Terrell. Condenia claims Terrell shot Victim while Victim was trying to break up the fight between Terrell and Telvin. Furthermore, Condenia stated Telvin took a gun out of Victim's holster after Victim was shot. On cross-examination, Condenia testified that Jamal told Terrell to calm things down, but that is when Terrell took the gun from Jamal's back pocket and shot it at Victim. She stated she saw Jamal grab the gun back from Terrell and shoot towards Victim as well.

Troy observed a fight between Terrell, Jamal, Michael, and Telvin. Troy also testified that he saw Terrell with the gun, and Terrell fired the gun once in the victim's direction. After that shot, Troy stated the victim slumped over while slightly backing up, and Jamal began firing a gun, although he was not sure where Jamal got the gun.

Carlos Jenkins, Sr. stated he saw Michael pulling Telvin off Terrell and Victim hit Michael in the back of the head with a gun. When the gun struck Michael, Jenkins testified the gun unloaded. Jenkins began running and could not see anything, but he heard more shots fired. Jenkins then said he turned back around and saw a man he did not know firing a gun, but did not see anyone get shot. Jenkins also stated he never saw Jamal or Terrell with a gun.

Jamal B., Jenkins' cousin, testified that while walking with Jenkins, he saw Michael try to intervene in a fight between Telvin and Terrell. Jamal B. stated he saw Victim pull out his gun and chop Michael in the back of the head with it, at which point the gun fired. Jamal B. then indicated he also saw another unidentified male firing a gun, but did not see the victim get shot. Jamal B. stated he did not see Terrell or Jamal fire a gun.

Detective Allen Kramitz arrived at the scene after the shooting and blamed the many conflicting accounts on there being "so many people and so much going on." Seven .380 millimeter casings, one .9 millimeter casing, and eight projectiles were found at the scene, in addition to one projectile discovered during the autopsy of Victim. Kramitz stated it was "highly unlikely that the same person discharged both the .9 millimeter and the .380." The projectile recovered from the

victim's autopsy was consistent with a .380 automatic weapon, fired by the same gun as the .380 projectiles recovered from the scene. Victim's 9 millimeter handgun, which was given to the police by Victim's family, fired one of the projectiles recovered from the scene.

After listening to all the evidence, the family court found the State's witnesses to be credible. The family court found the defense witnesses credible, to a certain extent, but did not find the testimony regarding the unknown, unidentified man believable. Furthermore, the court found as follows:

What occurred on this particular evening was two young men came to this location armed with a weapon. They came seeking a confrontation, and they got it. There was no testimony that [victim] approached these young men in any sort of aggressive or hostile manner, although, he carried a weapon as well. What ensued from that is a fight that I [the family court judge] believe was being provoked and promoted by these two young men. [The victim's] brother decided that he was going to join in, and that was the match that lit the fire.

The family court then ruled as follows about voluntary manslaughter being a consideration in this case:

The largest question with which I've had to grapple is whether the gun discharging—the gun used by [the victim] discharging was sufficient provocation to reduce this from murder to manslaughter. After a great deal of deliberation and consideration on this issue, I do not find it to be sufficient provocation. I believe the discharge was accidental. Although the gun was being used as a weapon, it was not being used as a firearm.

In return these two young men used a gun with malice with the intent to inflict serious injury or death. And no matter how sufficient the provocation, it cannot overcome their intent to inflict this serious injury or death. Therefore, I do find these defendants to be delinquent on the charge of murder.

The family court found Jamal delinquent on the charge of murder, unlawful possession of a handgun by a minor, unlawful possession of a handgun, and discharging or use of a firearm during the commission of a violent crime. Jamal was

sentenced to the Department of Juvenile Justice for an indeterminate period not to exceed his twenty-first birthday.

## STANDARD OF REVIEW

 "In criminal cases, the appellate court sits to review errors of law only." *State v. Rios,* 388 S.C. 335, 337, 696 S.E.2d 608, 610 (Ct.App.2010) (citing *State v. Baccus,* 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006)). "Thus, this court is bound by the trial court's factual findings unless they are clearly erroneous." *Id.* (citing *Baccus,* 367 S.C. at 48, 625 S.E.2d at 220). " 'On review, this [c]ourt is limited to determining whether the circuit court abused its discretion.' " *Id.* at 338, 696 S.E.2d at 610 (quoting *State v. Simmons,* 384 S.C. 145, 158, 682 S.E.2d 19, 26 (Ct.App.2009)). "This [c]ourt does not reevaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the circuit court's ruling is supported by any evidence." *Id.* (quoting *Simmons,* 384 S.C. at 158, 682 S.E.2d at 26).

## LAW/ANALYSIS

### I. Voluntary manslaughter

 Jamal argues the family court erred in finding "no matter how sufficient the provocation" was to reduce the crime from murder to voluntary manslaughter, Jamal's intent to inflict serious injury or death made the crime murder. This issue is not preserved for our review.

 Generally, an issue must be both raised to and ruled upon by the trial court in order to be preserved for appellate review. *State v. Dunbar,* 356 S.C. 138, 142, 587 S.E.2d 691, 693–94 (2003). Arguments raised for the first time on appeal are not preserved for our review. *See State v. Jones,* 392 S.C. 647, 655, 709 S.E.2d 696, 700 (Ct.App.2011). "Although this court has advocated excepting juvenile criminal matters from the strict rules of issue preservation, [our] supreme court has declined to address whether such an exception should be recognized." *In re Walter M.,* 386 S.C. 387, 392, 688 S.E.2d 133, 136 (Ct.App.2009); *see In re Arisha K.S.,* 331 S.C. 288, 296, 501 S.E.2d 128, 133 (Ct.App.1998) (inviting the supreme court to address the setting aside of the rules of issue preser-

vation in the context of juvenile criminal matters). Thus, this court remains bound by this state's longstanding rules of issue preservation. *See In re Walter M.*, 386 S.C. at 392–93, 688 S.E.2d at 136.

Jamal did not raise an objection to the court's consideration and ultimate rejection of the lesser-included offense of voluntary manslaughter during the reading of the verdict. Furthermore, Jamal did not make a post-trial motion requesting reconsideration of the denial to charge voluntary manslaughter. While the trial court may have made contradictory remarks and stated an improper standard for voluntary manslaughter, Jamal should have objected to those statements. Without an objection, the trial court had no opportunity to clarify its decision, and the issue is not appropriately preserved. Accordingly, we find the issue of reconsideration of the denial of a charge of voluntary manslaughter not preserved for appellate review; thus, we affirm the family court.

## CONCLUSION

Based upon the foregoing reasons, the family court is **AFFIRMED.**

HUFF and PIEPER, JJ., concur.