# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Philip David Guderyon, Appellant.

Appellate Case No. 2017-002168

———————

Appeal From Horry County
Benjamin H. Culbertson, Circuit Court Judge

———————

Opinion No. 5955
Heard October 12, 2021 – Filed December 7, 2022

———————

## AFFIRMED

———————

Appellate Defender Susan Barber Hackett, of Columbia,
for Appellant.

Attorney General Alan McCrory Wilson and Senior
Assistant Deputy Attorney General William M. Blitch,
Jr., both of Columbia, and Solicitor Jimmy A.
Richardson, II, of Conway, all for Respondent.

———————

**MCDONALD, J.:** Philip Guderyon appeals his conviction for assault and battery of a high and aggravated nature, arguing the circuit court erred in failing to grant his motion for a directed verdict and in instructing the jury on self-defense and intent. We affirm.

**Facts and Procedural History**

On October 16, 2015, Justin Hodges (Victim) and his girlfriend, Mariah Stevens, went to Carlos 'n Charlie's in Myrtle Beach to play pool and meet some friends. Appellant and his friend, James "Jimer" Petrocine, were also at Carlos 'n Charlie's that night. At some point, Appellant punched Victim in the face or head; Victim suffered severe brain trauma and ultimately died. Once he was identified, arrested, and transported to the Myrtle Beach Police Department, Appellant admitted to striking Victim but claimed he acted in self-defense. The Horry County grand jury subsequently indicted Appellant for assault and battery of a high and aggravated nature (ABHAN).

At trial, witnesses described the events at Carlos 'n Charlie's, the bouncers' response to Victim's injury, and the subsequent law enforcement investigation. Jimer testified he was out on the dance floor when Stevens approached him. Jimer was playing with Stevens's breasts when Victim grabbed his arm and said "that's my girlfriend." Jimer responded, "well you can have your girl," and the two men shook hands. According to Jimer, at that point, "[i]t was done; it was over with. There was no extra beef with it really." However, just as Jimer was turning away, he "felt some wind come over [his] shoulder" and heard "like a hit, and then [Victim] was on the ground." Jimer testified he did not feel threatened by Victim, he was not scared, and he was not in need of protection because there "was nothing to protect." He did not see any punches thrown, nor did he see what caused Victim "to go down." Jimer believed Appellant was standing next to the bar when Victim hit the floor, but he later learned Appellant was the person who struck Victim.

Stevens's account differed—Stevens claimed she "went to give [Jimer] a hug and he touched my breast." "So I told him not to touch me and I went and said something to [Victim], and he went and talked to [Jimer]." After the two men talked, they all played pool together and "everything was fine." Stevens never witnessed any aggression from either man. As Stevens and Victim were leaving, Stevens went to the restroom and Victim stood against a wall toward the entrance talking to someone[1] while he waited for her, but when Stevens returned, "he was gone." Stevens did not see what happened, but she was "certain that there was no sort of physical altercation or anything" before she went to the restroom.

Other witnesses recounted the events that occurred while Stevens was in the restroom. It is undisputed that when he was struck and fell to the floor, the club's bouncers did not wait for medical personnel to arrive before moving the

---

[1] Stevens noted, "I think he was talking to Jimer, I don't remember."

unconscious Victim.  Instead, they dragged him through the bar, dropping him inside at least once before they left him outside.  Victim was then transported to Grand Strand Medical Center where he underwent brain surgery.

Hospital staff called the Myrtle Beach Police Department in an effort to determine Victim's identity; they gave law enforcement two phones, two sets of keys, and a wallet, in which officers found an identification card.  Officers then went to Broadway at the Beach, where Carlos 'n Charlie's is located, and "started walking through the parking lot clicking key fobs."  When a car chirped, the police ran the tag and learned the vehicle belonged to Victim.  Inside, officers found a woman's purse and some mail addressed to the victim and two other individuals.  They then searched Facebook for Victim's name, seeking a photograph or other information that might assist the investigation.  Officers also went Carlos 'n Charlie's to gather video surveillance.

Dr. Joseph Cheatle, the neurosurgeon who treated Victim at Grand Strand, testified Victim suffered a subgaleal hematoma on the back of his head as well as a subdural hematoma on the right frontal lobe of his brain.  He explained:

> [A]nytime you have an injury or a stop, just like when you're in a car and you push on the brakes real hard and the seat belt holds you, the brain does the same thing where it can basically glide and that causes what's called a [contrecoup].  In other words, the opposite injury.  So, you can have either [coup], which means at the direct site, or a [contrecoup] injury.  So, what happens is that you have something that hits you, you can have the exact opposite so contra meaning opposite, [coup] means area of injury.  You have the opposite area that actually has the hemorrhage, and so that's what it appears that happened to [Victim] was he had a force applied to the back of his head; but the front of his head on the exact opposite trajectory received the bleed.

Dr. Cheatle performed a decompressive craniotomy to open a skull flap and relieve the pressure on Victim's brain.  However, after several days, Victim's brain began to swell.  In an effort to save Victim's life, doctors performed a second surgery to remove his frontal lobe.  Dr. Cheatle testified that although Victim suffered a vascular skull fracture, he did not have a black eye nor any facial bruising.  In his opinion, "[Victim] had an assault to the back of his head."  Dr. Cheatle admitted on

cross-examination that while he had no knowledge of the specific mechanism of Victim's injury, the force to the back of Victim's head was caused by a single blow. This blow could have come from human contact, such as a punch, an object employed by a human being like "a bat, a blunt object, or pipe wrench," or even a hard surface like a brick wall.

At the close of the State's case, Appellant moved for a directed verdict on the basis that the State failed to prove causation as to Victim's injury, specifically the mechanism of the blow to the back of his head. Appellant argued Dr. Cheatle's testimony created an uncertainty entitling him to an acquittal as a matter of law. Yet, Appellant conceded he told police he struck Victim in the face, and it was possible Victim suffered the brain trauma as a result of falling and striking his head on the floor.

In response, the State argued the circumstantial evidence, including the video surveillance, demonstrated Appellant sucker-punched Victim in the back of the head. When the circuit court asked whether the State was "shifting gears" and arguing Appellant could have punched Victim in the front of his head, the State claimed it was not pursuing a frontal blow theory due to Dr. Cheatle's testimony and Victim's lack of facial bruising. Still, the State eventually conceded a jury could determine Victim received a frontal blow and the fatal injury resulted from his head striking the floor. The State emphasized it was undisputed Appellant punched Victim and great bodily injury resulted from the blow to the back of Victim's head.

The circuit court denied Appellant's motion, stating it "was a close call." The circuit court elaborated:

> I've reviewed the case law and it deals with the existence
> of evidence and, even though the State—I don't know
> that there's evidence that proves their theory or where a
> reasonable juror can rely upon beyond a reasonable doubt
> that there was a sucker punch to the back of the head,
> they certainly have presented evidence that there was a
> punch by the [Appellant], that created great bodily injury
> to the victim and coupled with—what was it the doctor—
> well, that's substantiated by Dr. Cheatle's testimony of
> the great bodily injury, and [Jimer]'s testimony that no,
> there was no hassle, we shook hands, we were okay, and
> then I felt this whoosh come over my shoulder.

What I was wrestling with and I want to put it on the record is what do you do when, yes, there is enough evidence of a crime but not based upon the State's theory, I mean, I don't see where there is any evidence of a sucker punch to the back of the head, but that's the State's case, that's the State's theory, that's what the State is going on. Now, they have raised the argument in defense of the directed verdict, that it doesn't matter. Well, that hasn't been their theory at all along. I can't find a case on point in that regard. And so based upon that, I'm gonna go ahead and I'm gonna deny your motion although it is the State's theory that there is a sucker punch to the back of the head. But I think there is enough evidence to get to the jury that there was a punch that caused—there is evidence that it was a likelihood or did cause great bodily injury and based upon [Jimer]'s testimony that we were okay gets around the self-defense at this juncture.

During the defense's case, Ambrose Heavener—who met Appellant while the two were jailed at the Horry County Detention Center—testified he was at Carlos 'n Charlie's on the night of the incident. He recalled "there was an altercation" between two men, which progressed from a loud argument, but "it wasn't really a fight per [se], it was just, you know, [a] standoff, with a, you know, a swing and that was it." The two men stood "chest to chest, face to face, it looked like they were going at it pretty good for a minute there and, you know, standing with their fists kind of balled at their sides and just looked like they were fixing to start a fight, basically." Appellant approached this altercation and put his hands in between the men, "kinda trying to separate them, calm it down." When Appellant interceded, "the taller fellow turned real fast toward [Appellant] like he was going to hit him, and, from what I could tell, it looked like he was about to hit him. And when that happened is when [Appellant] swung and hit him and he fell down." "It looked to me like [Appellant's punch] hit [Victim] on the face on the left side because he was standing on that side of him."

Steven Sumpter, another jailhouse witness, also claimed he was at Carlos 'n Charlie's the night Victim was struck. Sumpter testified he was sitting at the bar when he saw Appellant "get up and go towards what looked like a little commotion going on over near the dance floor." Appellant approached the ongoing verbal argument between Jimer and Victim and "got in between the two of them." The

larger man then threw a punch at Appellant, who responded by hitting "him right in the face.  I'm not sure if it was the nose or where, but [Appellant] hit [Victim] in the face."  Sumpter continued, "Yeah, he went straight back. . . . like a sack of potatoes.  He just went straight backwards.  Like, you know, he had like nothing there, he's just out on his feet."  When asked whether Victim had any control over his limbs as he fell, Sumpter replied, "None whatsoever.  It was like [Appellant] knocked him out with one punch."

At the conclusion of the defense's case, Appellant renewed his motion for a directed verdict, which the circuit court again denied.  The court subsequently instructed the jury on ABHAN, assault and battery in the second degree, assault and battery in the third degree, and self-defense.  During deliberations, the jury asked, "[A]re we to consider intent as to which level of assault this is or is the resulting harm the deciding factor?"  Over Appellant's objection, the court instructed the jury:

> To convict the Defendant of assault and battery of a high and aggravated nature, the State must prove beyond a reasonable doubt that the Defendant intended to unlawfully injure another person, and either great bodily injury to that person resulted or the act was accomplished by means likely to produce death or great bodily injury.

Instructions on intent and the lesser-included offenses followed.  Approximately ten minutes later, the jury found Appellant guilty of ABHAN.  Appellant moved for a new trial, which the circuit court denied.  The court sentenced him to ten year's imprisonment.

**Law and Analysis**

**I. Directed Verdict**

Appellant first asserts the circuit court erred in declining to direct a verdict because the State failed to present evidence that he caused the injury to the back of Victim's head or that his single punch was likely to produce death or great bodily injury.  We disagree.

"In reviewing a motion for directed verdict, the trial court is concerned with the existence of evidence, not with its weight."  *State v. Phillips*, 416 S.C. 184, 192, 785 S.E.2d 448, 452 (2016).  "When the evidence presented merely raises a

suspicion of the accused's guilt, the trial court should not refuse to grant the directed verdict motion." *Id.* "'Suspicion' implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof." *State v. Lollis*, 343 S.C. 580, 584, 541 S.E.2d 254, 256 (2001). "If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find the case was properly submitted to the jury." *Id*.

"[T]he lens through which a court considers circumstantial evidence when ruling on a directed verdict motion is distinct from the analysis performed by the jury." *State v. Bennett*, 415 S.C. 232, 236, 781 S.E.2d 352, 354 (2016). "The jury's focus is on determining whether every circumstance relied on by the State is proven beyond a reasonable doubt, and that all of the circumstances be consistent with each other and, taken together, point conclusively to the guilt of the accused to the exclusion of every other reasonable hypothesis." *Phillips*, 416 S.C. at 193, 785 S.E.2d at 452. "The trial court must view the evidence in the light most favorable to the State when ruling on a motion for directed verdict, and must submit the case to the jury if there is" any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced." *Id.* (quoting *State v. Littlejohn*, 228 S.C. 324, 329, 89 S.E.2d 924, 926 (1955)). While "the jury must consider alternative hypotheses, the court must concern itself solely with the existence or non-existence of evidence from which a jury could reasonably infer guilt." *Bennett*, 415 S.C. at 237, 781 S.E.2d at 354.

With respect to Appellant's ABHAN charge, the statute provides:

> (B)(1) A person commits the offense of assault and battery of a high and aggravated nature if the person unlawfully injures another person, and:
>
> (a) great bodily injury to another person results; or
>
> (b) the act is accomplished by means likely to produce death or great bodily injury.

S.C. Code Ann. § 16-3-600(B) (2015). The statute defines "great bodily injury" as "bodily injury which causes a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of a bodily member or organ." S.C. Code Ann. § 16-3-600(A)(1) (2015).

As the circuit court noted, there is no direct evidence in the record supporting the State's theory that Appellant struck Victim in the back of the head. Even the State's expert witness, Dr. Cheatle, conceded Victim's injuries could have resulted from Victim's head striking the floor after he fell. In fact, while the video surveillance and still photographs do not show Appellant striking Victim, they do show Victim falling backward and landing with his feet pointed toward the ceiling. The video surveillance and still photographs also show two bouncers dragging Victim away from the dance floor towards the exit.

Our review of the record confirms substantial circumstantial evidence exists to support Appellant's guilt in that his single punch caused Victim's injuries, likely by way of a punch to Victim's face that caused Victim to fall and strike his head on the floor. The State presented abundant evidence, including Appellant's own statement to police,[2] requiring the circuit court to deny his directed verdict motion. Heavener testified Victim "went down" right after Appellant "hit [Victim] on the face on the left side because [Appellant] was standing on that side of [Victim]." Sumpter testified Appellant "hit [Victim] right in the face. I'm not sure if it was the nose or where, but [Appellant] hit [Victim] in the face." Sumpter continued, "Yeah, he went straight back. . . . like a sack of potatoes. He just went straight backwards. Like, you know, he had like nothing there, he's just out on his feet." Thus, considering the evidence in the light most favorable to the State, substantial circumstantial evidence exists that tended to show Appellant punched Victim and this punch resulted in great bodily injury and ultimately Victim's death. *See State v. Rogers*, 405 S.C. 554, 567, 748 S.E.2d 265, 272 (Ct. App. 2013) (stating "[c]ircumstantial evidence . . . gains its strength from its combination with other evidence, and all the circumstantial evidence presented in a case must be considered together to determine whether it is sufficient to submit to the jury.").

For purposes of the circuit court's analysis at the directed verdict stage, it does not matter which story the jury would later choose to believe. The State's theory—supported by the photograph of Victim's face and Dr. Cheatle's testimony as to the hematoma on the back of Victim's head—was that Victim sustained a [contrecoup]

---

[2] Despite Appellant's contention that he did "not use deadly force" and "all of the evidence indicated Appellant struck [Victim] once," that single blow ultimately caused Victim's death. Notwithstanding his argument that there "was no indication that Appellant used a weapon or excessively beat [Victim]," Appellant, by his own words, "kick boxed for thirteen years" and "really didn't even hit him with everything."

injury as the result of a single blow which caused him to fall backward. The jury may have instead chosen to believe the version presented by the defense witnesses—that Appellant punched Victim in the face with such force that he fell backward and sustained a contrecoup injury when his head struck the floor. In either scenario, the blow proximately caused Victim's injuries, which eventually resulted in his death. *See State v. Des Champs*, 126 S.C. 416, 120 S.E. 491, 493 (1923) ("The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred."). Accordingly, the circuit court properly denied Appellant's motion for a directed verdict.

## II. Self-Defense

Appellant next argues the circuit court erred in instructing the jury that in order for self-defense to apply, Appellant must have been in fear of great bodily injury or death when he struck Victim. We find no abuse of discretion here, as the circuit court charged the current and correct law of self-defense in South Carolina. *See State v. Mattison*, 388 S.C. 469, 479, 697 S.E.2d 578, 583 (2010) ("The trial court is required to charge only the current and correct law of South Carolina.").

"In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial." *Id.* at 478, 697 S.E.2d at 583. "A jury charge is correct if, when the charge is read as a whole, it contains the correct definition and adequately covers the law." *Id.*

During the charge conference, Appellant objected to the portions of the self-defense instruction requiring that the evidence show he was in imminent danger of death or serious bodily injury (or reasonably believed he was) to invoke the protection of self-defense. He argued that "from the Defense point of view," this incident involved "a punch for a punch."

The State agreed "the law could not be that a person must be in fear of losing his life in every situation," but relied upon the portion of the charge regarding fear of serious bodily injury as sufficient to cover situations in which a deadly threat is not posed. According to the State, in order to exercise one's right to self-defense, one "must be in fear of death or serious bodily injury"—anything less would preclude an instruction on self-defense in a case such as this.

Noting these arguments, the circuit court instructed the jury on the elements of ABHAN, including the lesser-included offenses, and charged as follows regarding the elements of self-defense:

> First, the Defendant must be without fault in bringing on the difficulty. If the Defendant's conduct was the type which was reasonably calculated to and did provoke an assault resulting in death or great bodily injury, the Defendant would be at fault for bringing on the difficulty and would not be entitled to an acquittal based on self-defense. The second element of self-defense is that the Defendant was actually in imminent danger of death or serious bodily injury or that the Defendant actually believed he was in imminent danger of death or serious bodily injury. If the Defendant was actually in imminent danger, self-defense requires that the circumstances warranted a person of ordinary firmness and courage to strike the fatal blow to prevent death or serious bodily injury. If the Defendant believed he was in imminent danger of death or serious bodily injury, self-defense requires that a reasonably prudent person of ordinary firmness and courage would have had the same belief. In deciding whether the Defendant actually was or believed he was in imminent danger of death or serious bodily injury, you should consider all the facts and circumstances surrounding the crime including the physical condition and characteristics of the Defendant and the victim. The Defendant does not have to show that he was actually in danger. If the Defendant believed he was in imminent danger and a reasonably prudent person with ordinary firmness and courage would've had the same belief, then the Defendant has the right to act on appearances, even though the Defendant's beliefs may have been mistaken. You must decide whether the Defendant's fear of immediate danger of death or serious bodily injury was reasonable and would have been felt by an ordinary person in the same situation. Words accompanied by hostile acts may, depending on the circumstances, establish self-defense. However, mere words, no matter how abusive, insulting, vexatious or

threatening they may be, will not justify an assault and battery unless accompanied by an actual offer of physical violence. The relative sizes, ages and weights of the Defendant and the victim may be considered in the [sic] deciding the apparent or actual need for force in self-defense and the amount of force needed.

The final element of self-defense is that the Defendant had no other probable way to avoid the danger of death or serious bodily injury and to act as the Defendant did in this particular instance. A person cannot be required to make an exact calculation as to the degree or amount of force which may be needed to avoid death or serious bodily harm. Therefore, in self-defense, the Defendant has the right to use the force needed to avoid death or serious bodily harm. The force used in self-defense does not have to be limited to the degree or amount of force used by the victim. The Defendant has the right to use so much force as appeared to be necessary for complete self-protection and which a person of ordinary reason and firmness would've believed to be needed to prevent death or serious bodily harm.

To establish self-defense in South Carolina, the following four elements must be present:

(1) the defendant must be without fault in bringing on the difficulty;

(2) the defendant must have been in actual imminent danger of losing his life or sustaining serious bodily injury, or he must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury;

(3) if his defense is based upon his belief of imminent danger, defendant must show that a reasonably prudent person of ordinary firmness and courage would have entertained the belief that he was actually in imminent danger and that the circumstances were such as would

> warrant a person of ordinary prudence, firmness, and
> courage to strike the fatal blow in order to save himself
> from serious bodily harm or the loss of his life; and
>
> (4) the defendant had no other probable means of
> avoiding the danger.

*State v. Slater*, 373 S.C. 66, 69–70, 644 S.E.2d 50, 52 (2007). "If there is no evidence to support the existence of any one element, the trial court must not charge self-defense to the jury." *State v. Williams*, 427 S.C. 246, 249, 830 S.E.2d 904, 905–06 (2019).

Although Appellant agreed with "99 percent of the self-defense charge," he objected to the use of the phrase "serious bodily injury." Appellant could not "imagine that our courts think that it is the law that a person that is assaulted with something less than deadly force, a fist, does not have a right to defend himself. . . . I do not think that can possibly be the law in self-defense in this state." While this is certainly a question our appellate courts may need to address, and a concern other states have tackled under appropriate circumstances, such circumstances do not exist here.[3]

Initially, we question whether Appellant was entitled to a self-defense instruction in light of the evidence presented at trial. First, it does not appear that Appellant was "without fault in bringing on the difficulty." According to his own statement to police as well as the testimony of his two witnesses, Appellant walked from the safety of the bar area to the dance floor and inserted himself into a verbal altercation between Jimer and Victim, putting his hands on the two men to separate them. When he approached the two, Appellant was in no danger, nor could he have believed he was "in imminent danger of losing his life or sustaining serious bodily injury." Perhaps most significantly, Appellant had "other probable means

---

[3] *See e.g.*, *Byrd v. Isgitt*, 338 So.2d 374, 375 (La. Ct. App. 1976) ("The general rule is that where a person reasonably believes he is threatened with bodily harm he may use whatever force appears to be reasonably necessary to protect himself."); *Anders v. Clover*, 165 N.W. 640, 641 (Mich. 1917) ("There can be no doubt that one assaulted may justly exercise such reasonable force as may be, or as appears to him at the time to be, necessary to protect himself from bodily harm in repelling said assault.").

of avoiding the danger," in that he could have simply walked away from the situation on the dance floor.

Regardless, the circuit court provided a specialized and appropriate jury instruction in light of the evidence presented at trial. *See Mattison*, 388 S.C. at 479, 697 S.E.2d at 583 ("The law to be charged must be determined from the evidence presented at trial." (quoting *State v. Knoten*, 347 S.C. 296, 302, 555 S.E.2d 391, 394 (2001))); *State v. Fuller*, 297 S.C. 440, 443, 377 S.E.2d 328, 330 (1989) ("In charging self-defense, we instruct the trial court to consider the facts and circumstances of the case at bar in order to fashion an appropriate charge."). As previously stated, the circuit court charged the jury on the elements of self-defense, but then went further and added language instructing (1) Appellant was entitled to act on appearances; and (2) Appellant was not required to wait for a person to be actually attacked before acting.[4] Because the circuit court instructed the jury on the correct and current law of South Carolina based upon the evidence presented at trial, we find no error.

## III. Intent

Appellant argues the circuit court erred in responding to a question from the jury by giving a supplemental instruction that to find Appellant guilty of ABHAN, all the State had to prove regarding intent was that Appellant intended to injure another person with no regard to whether Appellant intended the level of injury that occurred. We disagree, as the circuit court's response provided correct definitions and adequately addressed the law.

"The standard for review of an ambiguous jury instruction is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution." *State v. Aleksey*, 343 S.C. 20, 27, 538 S.E.2d 248, 251 (2000). "In reviewing jury charges for error, this Court must consider the circuit court's jury charge as a whole in light of the evidence and issues presented at trial." *State v. Simmons*, 384 S.C. 145, 178, 682 S.E.2d 19, 36 (Ct. App. 2009). "To warrant reversal, a [trial] court's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant." *Id.*

---

[4] At Appellant's request, the circuit court removed language instructing the jury that Appellant had the right to act in defense of others.

In the indictment for ABHAN, the State alleged Appellant committed "an unlawful act of injury to [Victim,] which resulted in great bodily injury or the act was accomplished by means likely to produce death or great bodily injury to the victim in violation of Section 16-3-600(B), S.C. Code of Laws, 1976, as amended." The circuit court agreed the evidence presented at trial entitled Appellant to instructions on the lesser-included offenses of assault and battery in the second and third degrees and instructed the jury accordingly.[5]

During deliberations, the jury asked, "[A]re we to consider intent as to which level of assault this is or is the resulting harm the deciding factor? A copy of each of the three levels of assault may also be helpful." While discussing the question with counsel, the circuit court stated it planned to instruct the jury:

> To convict the Defendant of assault and battery of a high
> and aggravated nature, the State must prove beyond a
> reasonable doubt that the Defendant intended to
> unlawfully injure another person and either great bodily
> injury to that person resulted or the act was accomplished
> by means likely to produce death or great bodily injury.

The proposed instructions for the lesser-included offenses tracked this language. Appellant objected "to adding the word intent to the Court's previous charge" and requested a "charge on intent as a general proposition." According to Appellant, by adding the word "intent" and "placing emphasis on that word, intent," the circuit court would "suggest an answer to their question."

Over Appellant's objection, the circuit court gave the following supplemental jury instruction:

> Now, as to your question regarding intent. I think the
> best way to answer that is to tell you that what you must

---

[5] To establish assault and battery in the second degree, the State must prove a defendant "unlawfully injure[d] another person" (or attempted to unlawfully injure another person) and "moderate bodily injury to another result[ed] or moderate bodily injury to another person could have resulted." S.C. Code Ann. § 16-3-600(D)(l) (2015). For assault and battery in the third degree, the State must prove a defendant "unlawfully injure[d] another person, or offer[ed] or attempt[ed] to injure another person with the present ability to do so." S.C. Code Ann. § 16-3-600(E)(l) (2015).

first consider is whether or not the State has proved
beyond a reasonable doubt that the Defendant committed
[ABHAN].  To convict the Defendant of [ABHAN], the
State must prove beyond a reasonable doubt that the
Defendant intended to unlawfully injure another person,
and either great bodily injury to that person resulted or
the act was accomplished by means likely to produce
death or great bodily injury.  If you find that the State has
proved this beyond a reasonable doubt, then you find the
Defendant guilty of [ABHAN].  If you find that the State
has not proven this beyond a reasonable doubt you then
consider whether or not the State has proved beyond a
reasonable doubt that the Defendant committed assault
and battery in the second degree.

The circuit court's instruction on the lesser included offenses followed, and the court gave the jury a written copy of the full jury charge.  Approximately ten minutes later, the jury reached a verdict, convicting Appellant of ABHAN.

In argument before this court, the State asserted there is zero doubt Appellant intended an injury to Victim, noting, "When you punch someone, the intent that you have is to cause an injury."  Moreover, there is no question that Victim's resulting injury qualified as great bodily injury given the fact that he had to have part of his brain removed before he ultimately died.  Appellant's deliberate blow to Victim's head was evidence of intent to injure—the severity of the resulting harm provided the jury evidence of the statutory degree.  *See e.g.*, 6A C.J.S. *Assault* § 86 (2018) (explaining battery is a general intent crime, "and thus the required mental state entails only an intent to do the act that causes the harm").  The circuit court's instructions accurately communicated the law applicable to the trial evidence.

**Conclusion**

For the foregoing reasons, Appellant's ABHAN conviction is

**AFFIRMED.**

**WILLIAMS, C.J., and LOCKEMY, A.J., concur.**